<pre>
1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF MISSOURI
2                       WESTERN DIVISION

3

4   UNITED STATES OF AMERICA,    )
                                 )
5                     Plaintiff,)
                                 )
6          vs.                   )  Case No. 07-00093-01-CR-W-ODS
                                 )
7   RINGLING DAN COHN,           )  Monday, October 6, 2008
                                 )  Kansas City, Missouri
8                    Defendant.)

9

10            TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE ORTRIE D. SMITH
11                UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:
    FOR THE PLAINTIFF:           Mr. Kenneth Michael Warner
14                               United States Attorney's Office
                                 400 East 9th Street, 5th Floor
15                               Kansas City, Missouri 64106

16

17  FOR THE DEFENDANT:           Mr. John O'Connor
                                 Wagstaff & Cartmell
18                               4740 Grand Avenue, Suite 300
                                 Kansas City, Missouri 64112
19

20

21  COURT REPORTER:              Ms. Cynthia M. Johnson, RMR
                                 U.S. Court Reporter
22                               400 East 9th Street, Room 8552
                                 Kansas City, Missouri 64106
23                               (816)512-5657

24

    Proceedings reported by computer stenography; transcript
25  produced by computer.
</pre>

1                      I N D E X

2    RECORD............................................    3

3                    GOVERNMENT'S EVIDENCE

4    WITNESSES:

5        SUSAN RICHART
         Direct Examination by Mr. Warner................    6
6        Cross-Examination by Mr. O'Connor..............   22
         Redirect Examination by Mr. Warner.............   27
7
         DEBBIE PANUCO
8        Direct Examination by Mr. Warner...............   28
         Cross-Examination by Mr. O'Connor..............   40
9        Redirect Examination by Mr. Warner.............   42
         Recross-Examination by Mr. O'Connor............   47
10
     GOVERNMENT RESTS
11                    DEFENDANT'S EVIDENCE

12   WITNESSES:

13       LAKESHA MCLAUGHLIN
         Direct Examination by Mr. O'Connor.............   48
14       Cross-Examination by Mr. Warner................   52
         Redirect Examination by Mr. O'Connor...........   66
15
         MICHAEL WALDECK
16       Direct Examination by Mr. O'Connor.............   67
         Cross-Examination by Mr. Warner................   74
17   DEFENDANT RESTS

18   ARGUMENT...........................................   84

19   JUDGES RULING......................................   89

20   RECORD.............................................   91

21   SENTENCE...........................................   98

22   REPORTER'S CERTIFICATE.............................  101

23                    *    *    *

24

25

1

2          THE COURT:  Please be seated.

3          United States versus Ringling Dan Cohn.  The case

4  number is 07-93-01.  Mike Warner appears for the United States.

5  John O'Connor appearing with Mr. Cohn.

6          We are here this morning for sentencing.  The parties

7  have reviewed the presentence report and there are, there were

8  originally a number of objections to the presentence report,

9  including the government's position that Mr. Cohn violated

10  portions of the plea agreement which under Paragraph 19 of the

11  plea agreement would void the plea agreement in its entirety.

12          I understand from my conversation with counsel prior

13  to entering the courtroom this morning that the defendant

14  wishes to withdraw the objections to the presentence report

15  except those related to the report's conclusion that he

16  obstructed justice by falsely representing his medical

17  condition to the Court and by falsely representing his

18  financial condition to the Court.

19          If I conclude that Mr. Cohn has violated the plea

20  agreement then the plea agreement would be void including that

21  provision which sets the amount of loss at a number between

22  120,000 and 200,000.  And would leave open the issue of the

23  amount of loss which, obviously, also impacts the sentencing

24  guidelines.

25          Have I accurately stated the status of the case at

1    the moment, Mr. O'Connor?

2             MR. O'CONNOR:  Yes, Judge.  And for the record we

3    withdraw the other objections made.  And I want to put on the

4    record the reasons that we're doing that, if that's okay.

5             THE COURT:  Sure.

6             MR. O'CONNOR:  Basically, Judge, we entered into a

7    plea agreement in this case where both parties were going to

8    recommend at sentencing today a 34-month sentence to the Court.

9    And at that time the Court had all the information available to

10   it, all the arguments of the government and myself on behalf of

11   Mr. Cohn and this was --

12            THE COURT:  In the interest of completeness,

13   Mr. O'Connor, I had your arguments.  I did not have the

14   presentence report.

15            MR. O'CONNOR:  That's correct, Judge.  I'm sorry.

16            And at the time of sentencing the Court indicated,

17   obviously, the sentence would still be up to the Court, if the

18   34 months was appropriate, but I believe the Court normally in

19   these cases listens to the lawyers and agreements they make

20   because I think the Court believes the lawyers know more about

21   the case than the Court in most instances.  And not saying what

22   the Court would have ultimately done, but that was a sentence

23   that was going to be anticipated here today.

24            In the interim there have been two issues that the

25   Court has just defined that has now changed that dynamic.  And

1    the government has taken a position that the plea agreement is

2    now void.  So that's why we're withdrawing the objections we

3    made previously, other than to address these two issues which I

4    think will ultimately drive the Court's decision in this case.

5    And we would have evidence to support our position on that

6    matter when the Court wants us to.

7           THE COURT:  And, Mr. Warner, do you want to add to

8    the record?

9           MR. WARNER:  Yes, Your Honor.  The only thing I would

10   add is that in the plea agreement which was executed in March

11   between the parties, Paragraph 19 expressly includes the

12   language in the opening sentence, if the defendant commits any

13   crimes, comma, violates any conditions of release.  I would

14   indicate, as we're all aware, and I'm referring to the docket

15   entry of this case, the Docket No. 45 indicates an entry on

16   April 25th of '08 that the Magistrate Court, Judge Larsen,

17   found that this defendant violated his conditions of release

18   and his bond was revoked.  There is also a transcript of that

19   bond hearing which is Document No. 46 for the record, and also

20   an order revoking that bond as Document 47.  I ask the Court to

21   take judicial notice of these docket entries.

22          THE COURT:  The Court will take judicial notice of

23   its Docket Entries 45 and 46.

24          Mr. Warner, I believe that its your burden to

25   establish by the preponderance of the evidence the facts that

1   you believe justify withdrawal of the 3-level reduction for

2   acceptance and the 2-level enhancement for obstruction.

3           Further, it would be your obligation to establish the

4   amount of loss.

5           If you're ready to proceed, I'll be happy to hear

6   from you.

7           MR. WARNER:  Susan Richart, the probation officer.

8           Your Honor, I would ask any defense witnesses, we

9   would invoke the witness rule at this time.

10          THE COURT:  All right.  The rule excluding witnesses

11  has been invoked and anyone expected to testify will be asked

12  to leave the room.

13              SUSAN RICHART, GOVERNMENT'S WITNESS, SWORN

14                        DIRECT EXAMINATION

15  BY MR. WARNER:

16  Q    Would you state your name and tell us your occupation,

17  please?

18  A    Susan Richart, Senior United States Probation Officer.

19  Q    And it's correct, you're the officer assigned to prepare

20  the presentence investigation report for this defendant,

21  Ringling Dan Cohn?

22  A    Yes.

23  Q    And just for the record, you completed your preliminary

24  report on May 21st of this year and your final report was

25  completed on August 25th of this year, is that correct?

1    A    That sounds accurate.

2    Q    All right.  And do you have a copy of your report up

3    there?

4    A    Not with me.

5    Q    Would it help you to have a copy?

6    A    Yes, please.

7    Q    On the table?

8    A    It's in the file.

9         MR. WARNER:  May I approach, Your Honor?

10         THE COURT:  Sure.

11   BY MR. WARNER:

12   Q    Now, in your final report on Page 13, Paragraph 56, you

13   assessed a two-level additional offense level adjustment for

14   obstruction of justice, is that correct?

15   A    Yes, it is.

16   Q    And based on your preliminary investigation in this case,

17   what two incidents did you base that adjustment on?

18   A    The failure to report assets that Mr. Cohn had access to

19   from a civil suit and the failure to accurately report his

20   medical condition to the magistrate judge.

21   Q    Okay.  And did you summarize both of those things

22   factually in your final report on Page 12 in Paragraphs 44

23   through 46?

24   A    Yes, that's right.

25   Q    And concerning specifically Paragraph 44 of your final

1   report, your request for financial information, can you

2   describe when in time you first communicated to Mr. Cohn the

3   need for you to receive this information?

4   A    Yes, I can.  I met with Mr. Cohn on March 19th to do the

5   presentence interview and provided him with all the financial

6   documents.  I requested that he return those to me no later

7   than March 26th.

8   Q    And did you provide instructions to him orally or

9   verbally?

10  A    Yes.  And I asked him or I instructed him to call me if he

11  needed assistance with the forms or questions on the forms.

12  Q    And if you could, if you recall, and let me jump around a

13  little bit.  But you've done this many times, is that correct?

14  A    Yes.

15  Q    How many times would you say, approximately?  I know you

16  can't give me an exact answer but how many times have you

17  communicated to defendants about the need to provide you full

18  disclosure of their financial situation?

19  A    Well over a hundred times.

20  Q    Okay.  And how complete and clear do you believe you were

21  when you communicated this need to Mr. Cohn?

22  A    I believe I was complete and clear.

23  Q    And did he express any misunderstanding or confusion when

24  you talked to him?  And this was face to face, correct?

25  A    Yes, it was.

1   Q    Did he have any confusion about anything you asked of him?

2   A    He didn't seem to.

3   Q    And did you have anything in writing that you also

4   provided Mr. Cohn?

5   A    Just the financial forms with the instructions.

6   Q    And that had instructions as well?

7   A    Yes.

8   Q    Were those instructions on the form read to him?

9   A    No, I did not read them to him.

10  Q    And if you will --

11            May I approach, Your Honor?

12            THE COURT:  Yes.

13  BY MR. WARNER:

14  Q    I'm going to hand you what has been marked as Government's

15  Exhibit No. 1 and ask if you recognize that exhibit?

16  A    Yes.

17  Q    Just to simplify matters, is that the net worth statement

18  including not only the statement that Mr. Cohn eventually

19  filled out but also the instruction sheet for the net worth

20  statement?

21  A    Yes.  It involves his monthly cash flow statements.

22            MR. WARNER:  For purposes of the proceeding, Your

23  Honor, I would move to admit Government's Exhibit No. 1.

24            MR. O'CONNOR:  No objection.

25            THE COURT:  Government's Exhibit 1 is admitted.

1        MR. WARNER:  May I approach, Judge?

2        THE COURT:  You may.

3  BY MR. WARNER:

4  Q    Now, did you also provide this form to Mr. Cohn on

5  March 19th of '08?

6  A    Yes.  That's when I gave him the first, that's probably

7  not the set of forms but, yes, I gave him that set of forms on

8  March 19th.

9  Q    And when did you tell him to complete them and return them

10 to you?

11 A    By March 26th.

12 Q    Okay.  And is a week period of time a typical turn around

13 period?

14 A    It is, yes.

15 Q    And did you receive the information back by March 26th of

16 '08?

17 A    No.

18 Q    Did you hear any explanation or reason for the failure to

19 return from Mr. Cohn?

20 A    No.

21 Q    Or his attorneys?

22 A    No.

23 Q    And when was the next time any communication occurred

24 concerning his obligation to return the forms?

25 A    I went to his house on April 9th to ask him if he needed

1  assistance with the forms and to pick them up.

2  Q    And did you meet directly with Mr. Cohn?

3  A    Yes.

4  Q    And by the way when you saw him that day, describe his

5  appearance?

6  A    He was wearing sweatpants and a T-shirt.  It appeared

7  maybe he'd been watching T.V. and relaxing at home.

8  Q    Was he ambulatory?  Today he's in a wheelchair.  Was he in

9  a wheelchair then?

10  A    No.

11  Q    Was he up and about?

12  A    Yes.

13  Q    Did you, when looking at him did he appear to be in any

14  discomfort or pain or could you tell?

15  A    It was hard to tell.  He didn't move quickly but he didn't

16  use a cane.

17  Q    And he was upright when he spoke to you?

18  A    I met him at the door.  Then we went into his living room

19  and he sat down on the couch when we were talking about the

20  financial forms.

21  Q    Now, in this time period from March 19th of '08 until

22  April 9th of '08, had either Mr. Cohn or any of his various

23  attorneys contacted you concerning the financial statement?

24  A    No.

25  Q    Okay.  And what did you say in response to, well, it's in

1  the mail?

2  A    I said that I would wait a couple days for it to arrive at

3  my office and that was it.

4  Q    So if you saw him on April 9th of '08 and apparently was a

5  Wednesday.  He said he mailed it on April 7th of '08, which is

6  a Monday.  When you came back to the office on April 9th did

7  you have it in the mail?

8  A    No.

9  Q    Did you have it any day thereafter?

10  A    No.

11  Q    Okay.  And why is this information important to you in a

12  fraud case for which you're preparing a presentence report?

13  A    It's important because restitution was involved.  And it

14  helps the government after sentencing to determine where the

15  assets are located and how restitution can be made.

16  Q    And, ultimately, those decisions, the sentencing

17  decisions, restitution decisions are made by the Court,

18  correct?

19  A    Yes.

20  Q    And what next occurred, if anything, in regards to

21  Mr. Cohn and his failure to return this information back to

22  you?

23  A    I called his attorney on April 14th and asked if they

24  could help with Mr. Cohn's financial statement.

25  Q    And what attorney did you speak with?

1  A    I left a message with John O'Connor and PJ called me back

2  two days later.

3  Q    And what, if anything, did PJ O'Connor say to you?

4  A    He said he would make sure we got the financial forms.

5  Q    That was on April 14th?

6  A    No.  It was April 16 when I spoke to PJ.

7  Q    Okay.  And you had left a message with the O'Connor Law

8  Firm on April 14th?

9  A    Right.

10 Q    That's correct?

11 A    Uh-huh.

12 Q    And what was the next communication or information, if

13 any, concerning the financial statement?

14 A    Shortly after I spoke to PJ, Mr. Cohn called and said he

15 believed the financial forms had probably been blown away in

16 the wind when he left them in the mailbox.  And if I could send

17 him a new set, he would complete them and send them right back.

18 Q    At that time did he make any statement about his financial

19 situation to you, just spuriously?

20 A    Not at that time, no.

21 Q    Did he say anything about having assets?

22 A    Not at that time.  We didn't talk about his assets on that

23 day.

24 Q    Okay.  And did you then send a second set of financial

25 statement documents to Mr. Cohn?

1    A    Yes, I did.

2    Q    And those went out on April 16th of '08?

3    A    I believe either the 16th or early the 17th.

4    Q    Did Mr. Cohn ever state to you, when he called you and

5    said the old ones had blown away in the wind, how he was going

6    to bring the new ones back?

7    A    I don't recall if he said.  I think he said he was going

8    to bring them in to me, personally, soon as he got them.

9    Q    And in the April '08 time period, what did you learn in

10   your position as probation officer concerning the alleged

11   compliance of Mr. Cohn and his pretrial release conditions?

12   A    Some time in that time period I learned that he had been

13   outside of his residence for other than medical treatment.  I

14   don't supervise his bond so I wasn't completely clear on how

15   important that was.  But evidently he was only to get medical

16   treatment when he was leaving his home.

17   Q    Did you become aware that an actual bond revocation

18   hearing was set in front of Judge Larsen on the date of

19   April 25, '08?

20   A    Yes.

21   Q    And did you actually attend that hearing?

22   A    Yes, I did.

23   Q    And hear the entirety of the evidence that was presented.

24   A    Yes.

25   Q    And that day prior to the hearing what did you receive

1  back regarding Mr. Cohn's case and your presentence report?

2  A    That day, just prior to the hearing, the pretrial officer

3  provided me with his, Mr. Cohn's financial statement.

4  Q    And is that the exhibit that we marked today as

5  Government's Exhibit 1?

6  A    Yes.

7  Q    And that's the information that you received from

8  Mr. Cohn.  And how did you actually get it?

9  A    A pretrial services officer brought it to me.

10  Q    It wasn't turned in to you, personally?

11  A    No.

12  Q    All right.  And I guess we could probably try to figure

13  this out and no need to do it for exact days but how late was

14  the submission of the financial information to you?

15  A    It was well over a month late.

16  Q    And when you looked at and reviewed the net worth

17  statement, how useful was the information provided to you in

18  your investigation and ultimate report?

19  A    Well, I use that for his financial section.  My financial

20  section is based upon this.  I also obtained some of his

21  bankruptcy records and credit bureau report but this is the

22  bulk of the financial section.

23  Q    Now, during the hearing, the bond revocation hearing on

24  April 25th, did you learn in the course of that hearing and

25  hearing the evidence about some bank account or bank accounts

1    that the defendant had access to?

2    A    Yes, I did.

3    Q    And did you then, after hearing that evidence, look to see

4    if that bank account information had been communicated on the

5    net worth statement?

6    A    Yes.

7    Q    And had it been?

8    A    No.

9    Q    Okay.  And if I could direct your attention to the first

10   page, the instructions of Exhibit 1 and kind of jump down 1, 2,

11   3, 4, 5 sentences there.  There are a lot of references to the

12   statutes that sound pretty legalistic but, I guess they should,

13   but to kind of cut in the middle there, it says to clarify that

14   the assets owned, jointly owned, or controlled by defendant.

15   And for your purposes when you say jointly owned, what do you

16   interpret that to mean?

17   A    We interpret it as any assets the defendant may have

18   access to or benefit of now or in the future.

19   Q    Okay.  And jumping down, there is a little bit more

20   language along those lines, assets or debts that are jointly

21   held by you and a spouse or significant other, assets or debts

22   that are held by a spouse or significant other.  I guess what

23   is the purpose for your report writing and requesting

24   information concerning net worth statement of asking about

25   these other people?

1    A    It's not uncommon in financial cases for a defendant to

2    transfer or reassign assets in order to avoid a restitution

3    order.  The government can assess assets belonging to a

4    defendant in a criminal case.  It's important that we're aware

5    of all the assets the defendant has access to for restitution

6    purposes.

7    Q    And did you at least when you spoke with the defendant in

8    person orally communicate this to him to the best of your

9    recollection?

10   A    At the initial meeting I said, you need to report all

11   assets you have access to but that was the initial meeting.  We

12   didn't speak about it after that.

13   Q    Okay.  Now, in the course of you attending the bond

14   revocation hearing and learning about another bank account that

15   he had access to, reportedly or allegedly, I guess not

16   allegedly but actually in the name of his putative

17   step-daughter, Lakesha McLaughlin.  Did, at any time either in

18   Exhibit 1 or to you orally or through his attorneys, did

19   Mr. Cohn ever talk to you about him receiving a civil

20   settlement in the approximate amount of $140,000?

21   A    He had mentioned in the initial interview there was a

22   civil settlement.  But never any mention of amounts or accounts

23   or anything of that sort.

24   Q    And did he report that at all on Exhibit 1?

25   A    No.

1  Q    And did he ever tell you what happened to that civil

2  settlement?

3  A    No.

4  Q    Would knowing about that civil settlement, particularly in

5  light of attending the bond revocation hearing on April 25th of

6  '08, have been important to you for purposes of your

7  presentence report?

8  A    Yes.

9  Q    Can you explain why?

10 A    It's a significant amount of money.  Important to have

11 full information for the presentence report.  It's a document

12 the Court uses in sentencing.  My job is to make sure I have

13 all the information I can, as accurately as possible.

14 Q    And given your position and experience, would you have

15 considered a civil settlement award granted to the defendant in

16 his name, say in late 2007, checks written out in his name but

17 the check is actually turned over to a significant other and

18 deposited in the significant other's name in a bank, would you

19 consider that still to be relevant information for purposes of

20 a net worth statement?

21 A    Yes.

22 Q    Again, sorry.  But can you explain why?

23 A    Because Mr. Cohn had access to those assets.  He was able

24 to enjoy the benefit of those assets while he was on bond.  And

25 clearly he would have when he was finished with his sentence as

1  well.

2  Q    And you were aware that during the bond hearing there was

3  evidence presented that the defendant actually just drove up,

4  and apparently without any discomfort, reached out and

5  conducted an ATM transaction and withdrew $500 from that

6  account?

7  A    That's my understanding, yes.

8  Q    Okay.  And how did you feel about the omission, I guess

9  let me express this a little bit better.  For purposes of your

10  presentence report and assessing whether or not the defendant

11  earned acceptance of responsibility and or may have obstructed,

12  how did you assess in this case the defendant's failure to

13  report this civil judgment?

14  A    I felt that that would be, qualify as obstruction of

15  justice for failing to provide full information to the

16  probation office under the guidelines.  And, generally, if

17  obstruction of justice enhancement is applied, acceptance of

18  responsibility is not granted.

19  Q    Okay.  And is that also stated in your presentence report,

20  Paragraph No. 44, Page 12, the very last sentence, the

21  defendant did not fully report his assets?

22  A    Yes.

23  Q    Did the defendant at any time during the time that you had

24  communication with him make any reference to his financial

25  situation or his financial status or assets?

1    A    He said he had no assets.  He had no money.

2    Q    He had no money.  Had no assets?

3    A    Right.

4    Q    How many times did he say that to you?  Do you recall?

5    A    He said it in the initial interview.  I think he did say

6    that when I went to see him at his residence.  He was upset

7    that I wanted the financial information.  He said he didn't

8    have anything.

9    Q    Did you feel, based on your interactions with the

10   defendant, your prior experience working these types of cases

11   and requesting financial information from people, did you sense

12   as a matter of your own opinion the defendant was recalcitrant

13   about providing information?

14   A    I felt that way.

15   Q    Okay.  And what accounted for that other than what you

16   just said?

17   A    He just wasn't cooperative.  Generally, uncooperative when

18   it came to the financial information.

19   Q    Okay.  Now, you, obviously, are aware that there was a

20   plea agreement entered in this case and a plea that occurred in

21   March of '08.  And it's the government's contention that that

22   plea agreement has been voided.  But for purposes of your

23   presentence report, you did calculate a total loss figure for

24   the Court, is that correct?

25   A    Yes, I did.

1   Q    And if we could reference that, you could tell me a page?

2   A    It's Page 13, Paragraph 52.

3   Q    Thank you.  You indicated a 14-level increase due to a

4   loss of approximately $640,820.28 cents.  Can you describe to

5   the Court how you calculated that loss amount?

6   A    With, I had several meetings with the FBI agent and,

7   specifically, the detective who investigated this case.  And

8   she provided me documentation regarding the loss figures.

9   Q    Okay.  And those loss figures are essentially derived from

10  the alleged taking of money by Mr. Cohn from Griffith Coombs'

11  bank accounts, is that correct?

12  A    That's correct.

13  Q    Various banks and bank accounts?

14  A    Yes.

15  Q    Was there discussion as well with the FBI about at least

16  the government's perceived ability to prove the entirety of the

17  loss?

18  A    Yes.

19  Q    Okay.  And did the government discuss with you, including

20  myself, I suppose, some of the limitations we might confront if

21  we proceeded to trial?

22  A    Yes.

23  Q    Concerning Paragraph 56 on Page 13 as well, you were

24  basing the adjustment for obstruction of justice, am I correct,

25  and let me clarify.  I may be incorrect.  Not only on the

1  alleged failure to report substantial assets to the probation

2  office but also based on his revocation of bond?

3  A    Yes, you are correct.  It's a separate incident.

4  Q    Is that also true for the adjustment for acceptance of

5  responsibility?

6  A    Yes.

7  Q    So you aren't just basing either of those adjustments just

8  on the failure to report financial assets?

9  A    No.

10 Q    But you're including as well Judge Larsen's order revoking

11 bond from April of '08?

12 A    Right.  Judge Larsen found that he provided materially

13 false information to the Court and that's a big part of it.

14 Q    Okay.  And is it correct as well that at least from the

15 original objections that were filed by the defense attorneys in

16 this case, the loss amount in your PSR was not objected to?

17 A    No, it was not.

18 Q    Apparently as we limited the scope of the objections that

19 loss amount is still not objected to?

20 A    No, it is not.

21 Q    Okay.  That's all I have.  Thank you.

22        THE COURT:  All right.  Mr. O'Connor.

23        MR. O'CONNOR:  Thank you, Your Honor.

24                    CROSS-EXAMINATION

25

1  BY MR. O'CONNOR:

2  Q    What exhibit number was that?

3  A    One.

4  Q    One.  So that's this.  So we're referring to the same

5  thing?

6  A    Yes.

7  Q    Okay.  Thank you.

8         So as it relates to the adjustment for obstruction of

9  justice, the substantial assets that we're really referring to

10 here is the civil settlement.  Is that a fair statement?

11 A    Yes, sir.

12 Q    Okay.  And as it relates to the civil settlement, when did

13 you become aware that there were substantial assets that would

14 have belied what was put in the report of net worth by my

15 client?

16 A    I believe I learned about it just prior to the bond

17 revocation hearing the end of April.

18 Q    Okay.  So that would have been before you got the

19 completion of the net worth?

20 A    Right.  I believe it was.  I don't think I had my first

21 report.  That's accurate.

22 Q    Okay.  And I'm assuming that for purposes of a presentence

23 report, wherever you find out the information regarding assets

24 a defendant may have, whether it's from the defendant, from the

25 defense lawyer or from the prosecutor, that's something that

1    you take into consideration and make that information available

2    to the Court in the report, is that correct?

3    A    Correct.

4    Q    So when you got this report, even though the report says

5    no assets when you go through all of the information, you were

6    aware that there were assets and I'm assuming you were made

7    aware of that by the government?

8    A    Well, I got this report just about the same time I learned

9    about the assets.

10   Q    From the government?

11   A    Right.

12   Q    So nothing had been hidden from you in terms of what you

13   knew.  The government had already told you about that.  In

14   fact, this settlement had happened long ago.  I don't know if

15   you're aware but both parties knew of the settlement and what

16   had happened with the settlement.  Were you aware of that?

17   A    Yes, I was aware of that.  When I found out about the

18   civil settlement bank account, it was still being investigated.

19   Q    So this isn't a situation where a person filled out a form

20   then you found out later that they had misled you.  You had the

21   information before you even had the report he had?

22   A    I'm sorry?

23   Q    You had the information before he gave you this report of

24   net worth?

25   A    No.  I found out -- this all happened at the same time at

1    the bond revocation hearing.

2    Q    If I remember this, you can correct me, the bond

3    revocation hearing is when my client was in custody.  We had

4    gotten, I don't know where we got it, from his family, he had

5    filled it out.  I brought it to the hearing.  I think I gave it

6    to a pretrial officer who gave it to you?

7    A    Uh-huh.

8    Q    Does that sound about right?

9    A    I got it from a pretrial officer, yes.

10   Q    I think that's the same day he was back before Judge

11   Larsen on the revocation?

12   A    Yes.

13   Q    That's the same day that you found out about the civil

14   settlement?

15   A    Right.

16   Q    Okay.  And then as relates to the second part of your

17   obstruction argument is that he provided materially false

18   information to the magistrate.  Can you articulate in your best

19   words what you believe he materially false, what materially

20   false information he gave the magistrate that led you to ask

21   the Court for a two-level obstruction?

22   A    Used the wording from the report the Magistrate Judge

23   Larsen filed with the Court in that he provided intentionally

24   false information regarding his medical condition.

25   Q    And I think you said that you did not read this to him and

1   didn't know whether he read the instructions so to speak?

2   A    I did not read it to him.  I offered to help him if he had

3   questions.

4   Q    And in terms of your report for the court, is there, tell

5   me why you assess that information is used in your estimation

6   for the Court?

7   A    My job is to get all the information I can get regarding a

8   defendant and a case and provide it to the Court.

9   Q    And I'm assuming because of the role, the adjustment of

10  the obstruction of justice that you requested, that goes hand

11  in hand with your request that acceptance of responsibility not

12  be given.  It's kind of those both, for both of those reasons

13  we get to no acceptance of responsibility?

14  A    Exactly.

15  Q    Now, when you were at his house on that one occasion, can

16  you say with certainty that he did walk or did not walk without

17  a cane or do you remember?

18  A    He did not walk with a cane.  I remember that.  He didn't

19  have a cane.

20  Q    He did walk slowly you said?

21  A    I believe he did.  I don't think he was moving too quickly

22  but there is a flight of stairs from his door to the living

23  room which he managed to get up.

24          MR. O'CONNOR:  One second, Your Honor.

25          That's all I have.  Thank you very much.

1          THE COURT:  Mr. Warner?

2          MR. WARNER:  Briefly, Your Honor.

3                      REDIRECT EXAMINATION

4    BY MR. WARNER:

5    Q    Ms. Richart, concerning the civil settlement, you knew the

6    government had known there had been a civil settlement, right?

7    A    Right.

8    Q    And were you also aware that both the FBI and the

9    government didn't know where that money went?

10   A    Right.  That was my understanding.

11   Q    And that we were waiting for the net financial statement

12   or net worth statement to reveal that?

13   A    Yes.

14   Q    And is it correct that, in fact, our understanding,

15   meaning probation and the government's understanding of the

16   location of the civil settlement money was congruent with the

17   bond revocation proceedings and investigation leading up to

18   that?

19   A    Yes.

20   Q    Thank you.

21          THE COURT:  Recross?

22          MR. O'CONNOR:  No further questions.  Thank you.

23          THE COURT:  Thank you, Ms. Richart.  You may step

24   down.

25                                        (Witness excused.)

1          THE COURT:  Mr. Warner?

2          MR. WARNER:  Call Detective Panuco, Your Honor.

3          DEBBIE PANUCO, GOVERNMENT'S WITNESS, SWORN

4                      DIRECT EXAMINATION

5    BY MR. WARNER:

6    Q    Can you state your name and tell us your occupation,

7    please?

8    A    Debbie Panuco.  I'm a detective with the Kansas City,

9    Missouri Police Department.

10   Q    And what unit with the police department are you assigned

11   to?

12   A    I'm currently assigned to the Intelligence Unit.  However

13   I was assigned to Financial Investigations at the time of this

14   offense.

15   Q    And you are, if you will, the case agent or the case

16   detective assigned to the entirety of the investigation

17   concerning the defendant, Mr. Cohn?

18   A    I am.

19   Q    And are you familiar with the entirety of the

20   investigation and all of the reports and other information

21   that's been generated in this case?

22   A    I am.

23   Q    And you also testified with other officers at the

24   defendant's bond revocation hearing on April 25th of this year,

25   is that correct?

1   A    I did.

2   Q    And did you and other officers also do some investigation

3   at least leading up to Mr. Cohn's revocation on that date?

4   A    We did.

5   Q    And did that investigation involve surveilling Mr. Cohn as

6   was represented in evidence at that hearing of his trip to

7   Sam's Club or Home Depot, some place like that?

8   A    Yes, we did.

9   Q    Now, during that same surveillance activity, Mr. Cohn was

10  observed, I believe by you and others, to access an ATM and

11  receive money?

12  A    He did.

13  Q    And where was that ATM at?

14  A    It was located at the U.S. Bank on Ward Parkway.

15  Q    Okay.  And did you actually see Mr. Cohn conduct that

16  transaction?

17  A    I did not.  Another surveillance team member did.

18  Q    Okay.  What did that person report?

19  A    That he had, obviously, he pulled up to the ATM machine.

20  Entered the access or pin code into an account and removed

21  money from the ATM.

22  Q    And did you later determine what that amount was?

23  A    We did.  I believe it was $500 that day.  I'd have to

24  refer to my report.

25  Q    Now, prior to this time had you been actively

1    investigating, in conjunction with the probation office, an

2    attempt to try to ascertain Mr. Cohn's financial assets, money

3    holdings?

4    A    I had.

5    Q    And was that to assist not only the government for

6    purposes of a potential restitution hearing but also to provide

7    information to the probation office?

8    A    Yes, that's true.

9    Q    And were you aware that the defendant had been involved in

10   2007 in civil litigation with the Nelson Art Gallery?

11   A    Yes, that's accurate.

12   Q    Did that litigation in a nut shell surround the situation

13   he had with the deceased Griffith Coombs and many of the

14   antiques and properties and items that Mr. Coombs had

15   possessed?

16   A    It did.

17   Q    And did you learn of a settlement amount from that civil

18   suit?

19   A    I did.

20   Q    And what was that amount?

21   A    $300,000.

22   Q    Okay.  Did you at any time prior to April of '08 ascertain

23   what amount, if any, Mr. Cohn received?

24   A    I didn't know the exact amount at that time.  We didn't

25   believe that, initially, that he had received any money.

1    Q    Okay.  And what were you waiting on to see if his access

2    or possession of any civil settlement money existed?

3    A    We didn't know which bank it was located at.

4    Q    And what was he to turn over to the probation officer that

5    might have assisted you in figuring out whether or not he had

6    possession or access to any of that money?

7    A    Any financial information regarding any accounts that he

8    held, either in his name or in a person's name that he had

9    access to.

10   Q    Okay.  Did you, prior to April of '08, attempt to locate

11   bank accounts that he might have had or might have placed a

12   civil judgment in?

13   A    I have.

14   Q    Were you successful in locating any such assets in his

15   name?

16   A    Not until the day of the surveillance, no.

17   Q    Now, after you saw the defendant accessing the ATM at that

18   particular bank, describe if you will or summarize your

19   investigation of that bank and the accounts therein that the

20   defendant apparently had access to?

21   A    I served a subpoena on U.S. Bank and they provided

22   information in regard to a, according to the location, date and

23   time of the transaction, they were able to identify the

24   accounts that the money was withdrawn from.

25   Q    Okay.  And did you then further investigate the account or

1  accounts that Mr. Cohn apparently accessed and ascertain the

2  history of the accounts ,when they were opened and how, that

3  sort of thing?

4  A    I was.

5  Q    And can you describe what you discovered, please?

6  A    If I can refer to my report for exact dates.

7  Q    Okay.

8  A    That there was a checking account that was originally

9  opened on August 27th of 2007 in the name of Lakesha

10  McLaughlin, who I knew to be Mr. Cohn's girlfriend's daughter.

11  Then on August 31st of 2007 there was an investment money

12  market account that was opened also in her name.

13  Q    Okay.  Can you describe from your investigation how those

14  accounts were opened?

15  A    The initial checking account was opened with a $500

16  deposit, based on a check issued to Lakesha McLaughlin from

17  Michael Waldeck.

18  Q    Who do you know Mr. Waldeck to be?

19  A    He was the civil attorney representing Mr. Cohn on the

20  civil suits.

21  Q    What account activity did you see after that?

22  A    In the initial checking account, the deposit, there was

23  not any additional activity of note.  However the investment

24  account that was opened on August 31st was opened with monies

25  transferred from a $140,000 check issued to Lakesha McLaughlin,

1  put in the checking account and transferred into the money

2  market account.

3  Q    Did you get copies of those checks?

4  A    I did.

5  Q    And what was noted on the front of the check?  The

6  $140,000, that was made out to Lakesha McLaughlin?

7  A    Again, if I could refer to the copy of the check.  I

8  believe it says, civil litigation.

9  Q    It says what?

10  A    I believe it says civil settlement or civil litigation.

11  Q    How about Cohn settlement?

12  A    Okay.  That's accurate.

13  Q    Who actually wrote the check to Lakesha McLaughlin?

14  A    It was signed by Michael Waldeck.

15  Q    And so Michael Waldeck writes a check in the amount of

16  $140,000 to Lakesha McLaughlin with a memo notation of Cohn

17  settlement.  Did I get that right?

18  A    That's correct.

19  Q    And so not to complicate things because I have trouble

20  handling more than one account myself.  But there are two

21  accounts, a money market account and a checking account, is

22  that correct?

23  A    Yes, that's correct.

24  Q    All right.  And the date, approximately in time, these

25  accounts are opened is when?

1    A    The checking account, August 27th of '07, and the money

2    market account, August 31st of '07.

3    Q    Now, at this time Mr. Cohn is, has already been charged

4    and was charged in March of '07, is that correct?

5    A    That's accurate.

6    Q    And he was detained and in custody, is that correct?

7    A    Yes.

8    Q    All right.  And was there any information provided to the

9    bank about Lakesha Mclaughlin, her approximate age, employment?

10    A    She provided identification at the time the account was

11    opened.

12    Q    Okay.  And how old is Ms. McLaughlin?

13    A    She was born in 1979.

14    Q    Okay.  And she's the daughter of the mother, Patricia

15    Foreman, is that correct?

16    A    That's correct.

17    Q    And Patricia Foreman is the long time, I guess, putative

18    spouse, although not legally married, of Mr. Cohn, is that

19    correct?

20    A    That's accurate, yes.

21    Q    From your investigation throughout the entirety of this

22    case, did Ms. McLaughlin assist Ms. Foreman, Mr. Cohn when they

23    all had the company of Griffith Coombs?

24    A    She did.

25    Q    Okay.  And what employment did Ms. McLaughlin represent

1  for herself when she opened up this account?

2  A    She stated that she worked for a company called, Whole

3  Person.

4  Q    Is that a home care business?

5  A    It is.

6  Q    And who is her client?

7  A    During the time that she actually worked there it was her

8  mother.

9  Q    Patricia Foreman?

10 A    Yes.

11 Q    And if you know, what happened to that employment?

12 A    She hasn't worked, she hasn't shown any employment there

13 since the fourth quarter of last year.

14 Q    And Patricia McLaughlin was actually convicted last week

15 in this building for fraud?

16 A    She was.

17           MR. O'CONNOR:  Objection.

18           THE COURT:  Overruled.

19           MR. WARNER:  Okay.

20 BY MR. WARNER:

21 Q    Who was, regarding the bank accounts here, the

22 beneficiary?  The bank accounts that were opened under Lakesha

23 McLaughlin's name, who was her beneficiary?

24 A    Patricia Foreman.

25 Q    And from talking with bank officials and reviewing their

1    own opening notes, what was anticipated or who was anticipated

2    to be added to the accounts in the future per either

3    Ms. McLaughlin and/or Mr. Waldeck?

4    A    She referred to her stepfather.

5    Q    Okay.  And based on your knowledge of the case and the

6    individuals involved, who did you infer that to mean?

7    A    Dan Cohn.

8    Q    Now, other than surveilling Mr. Cohn in April of '08, how,

9    if at all, could you have learned of this account?

10    A    I could not have unless he had provided the information on

11    the form provided to him by the probation office.

12    Q    Now, at least from then till now, a little over a year,

13    can you summarize the activity of this account?  Essentially,

14    what has happened with the nearly $140,000 from August of '07

15    until nearly today?

16    A    I can.  It was set up that there would be a $5,000

17    transfer of funds from the investment account into the checking

18    account.  What subsequently occurred was that there were often

19    times much more than that transferred, again, from the

20    investment account into the checking account.  Often times as

21    much as $10,000 a month.

22           As of June of this year, there was a $50,000 transfer

23    from the investment account into the checking account.  The

24    funds were used for a variety of things, fast food restaurants,

25    grocery stores.  Appears there were probably gas purchases.

1  Liquor store.  Lot of clothing, jewelry that was purchased with

2  the funds.  There was a membership for Direct Buy of Kansas

3  City that was purchased out of that money.

4  Q    And how much money would you say has been expended,

5  approximately, from this civil settlement in the last twelve

6  months?

7  A    Well, as of September 11th which was the last date that I

8  had on the statements, in the money market account itself there

9  was $4,209.15 left.  As of the same date in the checking

10  account the balance remains of $46,038 and 38 cents.

11  Q    So roughly 90,000, a hundred thousand?

12  A    Yes.

13  Q    And are you aware of any employment either for Ms. Foreman

14  or Ms. McLaughlin throughout the year 2008, latter part of

15  2007?

16  A    No.  They did not show any employment at all.

17  Q    And is it your understanding that the house that they live

18  in at 1486 East 76th Terrace in Kansas City, Missouri, was that

19  also the house Mr. Cohn was staying in?

20  A    It is.

21  Q    And that's where he was residing when he was free on bond,

22  briefly?

23  A    Yes, he was.

24  Q    That house is paid for, is that correct?

25  A    Yes, it is, as part of the civil settlement.

1  Q    And there is also a Chrysler 300, 2006?

2  A    Yes.

3  Q    Car there.

4  A    Yes.

5  Q    Whose name is that car in?

6  A    It was, the last time I checked, in Ringling Cohn's name.

7  Q    Is that paid for?

8  A    It is.  They paid cash for the car.

9  Q    Do you recall how much it cost to purchase that car?

10 A    $35,199.

11 Q    And that was purchased in '06, is that correct?

12 A    Yes, it was.

13 Q    Now, once you received all of this bank account

14 information, you, obviously, turned that over to me and also

15 probation?

16 A    Yes, I did.

17 Q    And why did you feel this information was relevant to

18 probation?

19 A    Because I knew that part of the sentencing was based on

20 it.  Also there would be restitution required and those were

21 funds that were available to him for restitution.

22 Q    And there's been some testimony that you heard from

23 Ms. Richart concerning the total loss amount that is alleged in

24 the presentence report and she referenced talking to the

25 government and also you.  And you're familiar with the loss

1  amount that is alleged in the presentence report or PSR?

2  A    I am.

3  Q    And the amount is in the neighborhood of $640,000?

4  A    Yes, that's correct.

5  Q    Okay.  Can you describe at least from your perspective as

6  the primary investigator on this case how that amount was

7  calculated?

8  A    It was based on the fact that Mr. Cohn had total access to

9  Mr. Coombs accounts starting, beginning in 2003.  He was the

10  one who had control over the checking account.  He was, as a

11  part of the trust agreement, he was the person who was paid

12  into the checking account by the trust.  And at any time that

13  he requested additional funds, the bank often placed the funds

14  into that account.  He was the one who had access to be able to

15  get to the funds.  Mr. Coombs' health did not allow that.

16  Q    And that loss figure, for lack of a better way of

17  expressing it, was based on the government's and perhaps the

18  police department's perspective of the entirety of the loss

19  that we believe Mr. Cohn had facilitated?

20  A    That's correct.

21  Q    Now, did you also discuss with me and I think briefly with

22  probation and we discussed, in terms of both trial preparation

23  and plea negotiation strategies, difficulties that might be

24  encountered in proving that loss amount beyond a reasonable

25  doubt?

1    A    We did.

2    Q    Okay.  You know it remains to be seen if the plea

3    agreement is void or not but we alleged a smaller amount in our

4    plea agreement and you're aware of that, correct?

5    A    Yes, that's accurate.

6    Q    What was the basis for the lower amount for our purposes

7    in attempt to facilitate a viable plea agreement?

8    A    What we were able to prove beyond a reasonable doubt.

9    Q    And those were primarily based on activities conducted by

10   Mr. Cohn wherein he had forged and we had direct proof that he

11   had forged Mr. Coombs' signature, i.e. received money without

12   authority?

13   A    That's correct.

14   Q    Okay.  Did you feel, however, if we had proceeded to trial

15   that a reasonable inference, sufficient for purposes of proving

16   our case beyond a reasonable doubt, would have supported a

17   higher number, even the number that's in the PSR?

18   A    I do.

19   Q    And did you accept the difference for purposes of, at that

20   time, negotiating a conclusion to this case?

21   A    I did.

22            MR. WARNER:  I think that's all the questions I have.

23            THE COURT:  Mr. O'Connor?

24            MR. O'CONNOR:  Thank you, Judge.

25                         CROSS-EXAMINATION

1   BY MR. O'CONNOR:

2   Q    As it relates to this account, Detective Panuco, even as

3   of September 11th Mr. Cohn had not been added to the account, I

4   guess, anticipated by some note in the file?

5   A    He had not.

6   Q    Okay.  And was he a signature on the account or a

7   beneficiary of the account as it sat as of September 11th?

8   A    He was not.

9   Q    And any of the checks that you have described that have

10  gone out of that account, were any of those to the benefit of

11  Mr. Cohn on the face, whether money left on the books, maybe,

12  at a facility or anything like that?

13  A    I don't know that.

14  Q    In what you reviewed, did you see any such checks made out

15  to a facility like a prison facility for purposes of his

16  benefit?

17  A    There are many notations in here in regard to a

18  correctional facility, yes.

19  Q    All right.  Do you know what those amounts were?

20  A    If I can refer to the documents I can tell you.

21  Q    Okay.

22  A    Here's one entry from February 25th that is noted for

23  correctional bill for $156.95.  There is a variety of these

24  throughout the statement.

25  Q    Okay.  And do you know whether those were for phone calls

1  or for just money on the books?  Do you have any idea what the

2  use was?

3  A    I don't.

4  Q    All right.  As it relates to, you said that the only way

5  you could have found out about these accounts was by his

6  financial statement?

7  A    It wouldn't have been the only way but it certainly would

8  have been the easiest way.

9  Q    Wouldn't it have been an easier way to call me or

10 Mr. Waldeck or Mr. Warner to ask me or Mr. Waldeck in plea

11 negotiations, we need those account numbers before we make a

12 deal with you or I can't imagine we wouldn't have given them to

13 you.  The settlement was an open settlement.  Everyone was

14 aware of it.  Is there any reason you can't call me or Waldeck

15 and ask us the account numbers?

16 A    I don't normally call you, Mr. O'Connor, but I could have,

17 yes.

18 Q    That's all I have.

19           THE COURT:  Mr. Warner?

20                    REDIRECT EXAMINATION

21 BY MR. WARNER:

22 Q    I guess as a follow-up on that last question, Detective,

23 whose responsibility is it any way?  Is it yours or the

24 defendant's to provide that information?

25 A    It would be the defendant's responsibility to have

1  provided it.

2  Q    Okay.  Thank you.

3         THE COURT:  Detective, who were the parties to the

4  civil suit that was settled in 2007?

5         THE WITNESS:  It was, the original civil suit,

6  although I was not a party to it or had any participation in

7  it, was originally started by the Nelson Art Gallery against

8  the subject, Mr. Cohn.  They contested the will of Mr. Coombs.

9  I don't know who else was.

10        THE COURT:  You don't know whether there were other

11 defendants named?

12        THE WITNESS:  The only other, there were no other

13 defendants.  No.

14        THE COURT:  The original check that was used to open

15 the checking account at U.S.B.?

16        THE WITNESS:  Yes.

17        THE COURT:  Was that a check drawn on the attorney's

18 checking account?

19        THE WITNESS:  The original $500 check for the

20 checking account, yes.  It was drawn on the same account of

21 Mr. Waldeck that the $140,000 check was.

22        THE COURT:  Both checks then were drawn on

23 Mr. Waldeck's trust account?

24        THE WITNESS:  They were drawn on an account in his

25 name.  I don't know whether or not that's his business account

1   or personal account.

2               THE COURT:  Do you have copies of those checks?

3               THE WITNESS:  I do.

4               THE COURT:  Would you look, please, and tell me

5   whether the check was drawn on the trust account or his

6   business account?

7               THE WITNESS:  It does not say trust account on it.  I

8   have copies for you if you would like to see them, sir.

9               THE COURT:  We'll mark those as exhibits, please.

10              MR. WARNER:  May I approach, Judge?

11              THE COURT:  Yes, of course.

12              MR. WARNER:  For the record, Your Honor, I've handed

13  Detective Panuco Government's Exhibit 2.

14  BY MR. WARNER:

15  Q    And can you describe what's provided there in the various

16  pages?

17  A    I can.  It is the signature cards of Lakesha McLaughlin

18  for the accounts, copy of her non driver's ID card.  Deposit

19  tickets into the accounts for both the $500 and the $140,000.

20  It also includes two checks, one dated August 27th of '07 in

21  the amount of $500 that was signed by Michael Waldeck.  The

22  second check was dated August 31st of '07, also drawn on the

23  same account of Michael E. Waldeck on Country Club Bank.  That

24  is made out to Lakesha McLaughlin in the amount of $140,000.

25  Notation on the memo line is, Cohn settlement.  It is also

1    signed Michael E. Waldeck, endorsed Lakesha McLaughlin, for

2    deposit only.

3            MR. WARNER:  Judge, I would move to admit

4    Government's Exhibit No. 2.

5            MR. O'CONNOR:  No objection.

6            THE COURT:  Government's Exhibit 2 is admitted.

7            And Detective Panuco, did you attend the detention

8    hearing following Mr. Cohn's plea of guilty in this case

9    that --

10           THE WITNESS:  I did.

11           THE COURT:  -- that was conducted before Judge

12   Larsen?

13           THE WITNESS:  Yes.

14           THE COURT:  Did you also attend the bond revocation

15   hearing in April of this year?

16           THE WITNESS:  I did, yes, sir.

17           THE COURT:  Were there differences between what

18   Mr. Cohn represented his physical condition to be at the

19   detention hearing and what Judge Larsen found it to be at the

20   bond revocation hearing?

21           THE WITNESS:  There was.

22           THE COURT:  What were those differences?

23           THE WITNESS:  The representation initially by,

24   through his attorney, was that he was having difficulty walking

25   or he may have said, I would have to refer to the transcript

1     itself, whether or not he could walk at all.  That was not what

2     we observed the day of the surveillance.

3              THE COURT:  What did you observe?

4              THE WITNESS:  He walked from his house.  And having

5     been in the house, I knew that he would have to come down a

6     flight of approximately ten stairs to the landing and out the

7     side door.  We observed him exit the side door of the

8     residence, which acts as their front door.  Again, down several

9     more steps.  He entered the driver's side of the vehicle, the

10    Chrysler, with no difficulty.  He was using a cane.  He drove

11    to the bank at that time, withdrew the money from the ATM, did

12    not appear to have a problem turning to be able to access the

13    ATM machine.  Drove to Sam's Club in Grandview where he was

14    observed getting out of the vehicle.  Again, walking with a

15    cane but not with difficulty.  They spent, he and Patricia

16    Foreman, spent some time in the business itself.  He was

17    observed bending over, picking up cases of items, putting them

18    on the cart, in the cart, out of the cart.  Again, when he

19    exited, when they exited the business, the shopping cart,

20    itself, was full of items that they had purchased.  He walked

21    the cart to the car.  Opened the trunk.  He was observed

22    clearly bending over, picking up what I believe were cases of

23    water off the bottom shelf of the shopping cart and putting

24    them in the trunk.

25              THE COURT:  Was that the only occasion Mr. Cohn was

1    observed away from home?

2              THE WITNESS:  Yes.  By me, yes.

3              THE COURT:  Well, did your department or your unit

4    conduct other investigation or surveillance as to his

5    activities?

6              THE WITNESS:  No.

7              THE COURT:  Thank you.

8              Any follow-up questions, gentlemen?

9              MR. WARNER:  No.

10             THE COURT:  Thank you, detective.

11             MR. O'CONNOR:  I did have one, briefly.  I was going

12   to let Mr. Warner go first.

13                         RECROSS-EXAMINATION

14   BY MR. O'CONNOR:

15   Q    Did you become aware at the second hearing that just in

16   case this is an issue, I know it was with the Judge, that the

17   pretrial officer had given permission, although he wasn't

18   suppose to in light of the agreement, but did give him

19   permission to go where you observed him to go?

20   A    I did.

21   Q    Thank you.

22             THE COURT:  Thank you.  You may step down.

23                                        (Witness excused.)

24             THE COURT:  Mr. Warner?

25             MR. WARNER:  No additional evidence, Your Honor.

1        THE COURT:  Mr. O'Connor?

2        MR. O'CONNOR:  Could we have a 5-minute break?  One

3   of my witnesses came just before we came back to see you.

4        THE COURT:  We'll take a 5-minute recess.

5        We'll be in recess.

6                         (Recess)

7        LAKESHA MCLAUGHLIN, DEFENDANT'S WITNESS, SWORN

8                    DIRECT EXAMINATION

9   BY MR. O'CONNOR:

10  Q    You can pull that down.  There you go.  Would you state

11  your name, please?

12  A    Lakesha McLaughlin.

13  Q    And, Lakesha, your relationship with Dan Cohn?

14  A    Daughter.

15  Q    Okay.  And you're not Dan's natural daughter, is that

16  true?

17  A    Yes.

18  Q    You are not?

19  A    That's true.

20  Q    Okay.  But you and your mother have lived with Dan, is

21  that correct?

22  A    Yes.

23  Q    How long have you lived with Dan or have known Dan?

24  A    Been knowing Dan over the years.

25  Q    How many years?

1   A    Approximately, I'd say probably 15 years, over.

2   Q    And how old are you?

3   A    I'm 29.

4   Q    And what do you do?

5   A    I'm a massage therapist.

6            THE COURT:  I'm sorry.  I didn't hear that answer.

7            THE WITNESS:  Massage therapist.

8   BY MR. O'CONNOR:

9   Q    Having lived with Dan, were you aware or are you aware of

10  problems or issues he's had with his back?

11  A    Yes.

12  Q    Tell the Judge what you know about it.  Has he had this

13  back problem before he was ever charged with any criminal

14  offense?

15  A    Yes.

16  Q    Tell the Judge what you knew or observed about that?

17  A    Well, he had surgeries.  I don't know exactly when.  And

18  throughout the years he always complained about his back issue.

19  It always has bothered him while he walked, as far as I know.

20  Q    After Dan was charged with the crime that he ended up

21  pleading guilty to, he was put out on bond.  Did you see him at

22  home when he was out on bond?

23  A    Yes.

24  Q    And what was his condition with his back as you observed

25  it, yourself, while he was out on bond?

1  A    Well, I know he was having issues as far as in pain and
2  less mobility, as far as walking.  And he can bend to a certain
3  extent.
4  Q    Did he walk with any aids at all?
5  A    Yes.  He had a walker.
6  Q    Okay.  Did he also use a cane?
7  A    Yes.
8  Q    And did you try and help him any way therapy-wise to make
9  his back better so he would feel better?
10 A    Yes.  I helped him exercise, range of motion, apply hot
11 and cold packs.  Had him to soak in Epsom salts.
12 Q    How often did you do that while he was out on bond?  In
13 terms of 7 days a week, how many days would you try to help him
14 with his back in 7 days?
15 A    At least maybe 3 or 4 days out of 7 days.
16 Q    And did those treatments seem to help him?
17 A    Yes.
18 Q    And can you describe for us the difference from when you
19 gave him treatments than when you weren't giving him
20 treatments, how his back reacted?
21 A    Well, before the treatments, he had less mobility.  I got
22 the extension and, well, as far as bending and walking.  And
23 with the treatment, it helped him have more mobility.  He still
24 complained of pain, however, he did have more mobility while I
25 was working with him and helping him exercise and stretch.

1   Q    Now, at some point in time there was a civil settlement

2   reached and there was a bank account that was opened up,

3   Mr. Waldeck and you at a bank, is that true?

4   A    Yes.

5   Q    Tell the Judge what you understood about all that when it

6   happened?

7   A    Well, when we went to go set it up to open the account,

8   the banker that we sat down with had shared with us that Dan

9   cannot be on the account until he was able to get out, come in,

10  personally, with ID so he could be on the account.

11  Q    And the settlement was to Dan Cohn.  It wasn't to you?

12  A    Yes.

13  Q    Okay.  And so was the account then set up?

14  A    Yes.

15  Q    Okay.  And did, as you call him your dad, Dan Cohn, he was

16  in jail at the time, is that correct?

17  A    Yes.

18  Q    And I believe there was testimony there was a notation on

19  what you filled out that at some point he would be added to the

20  account?

21  A    Yes.

22  Q    Has he ever been added to the account?

23  A    No.

24  Q    And the signatures on the account, were you and your

25  mother as beneficiary?

1    A    Yes.

2    Q    Okay.  And was that done for any reason other than that's

3    what the bank suggested?

4    A    Yes.

5    Q    That's all I have.

6                        CROSS-EXAMINATION

7    BY MR. WARNER:

8    Q    Now, ma'am, you characterized yourself as Mr. Cohn's

9    daughter, is that correct?

10   A    Yes.

11   Q    And, again, Mr. O'Connor pointed this out.  You're not

12   necessarily his biological daughter but at least in your mind

13   you perceive him as a stepfather or father figure?

14   A    Yes.

15   Q    So you've been close to Mr. Cohn for over 15 years since

16   you were a teenager?

17   A    Not exactly.  We wasn't always close.  However, once I got

18   older and more mature, we was able to get along then.  Have a

19   better relationship, yes.

20   Q    And certainly during those better times he's someone you

21   trusted, is that a fair statement?

22   A    Yes.

23   Q    Someone you liked?

24   A    Yes.

25   Q    And someone you felt comfortable around, right?  Is that

1    true?

2    A    Yes.

3    Q    And you were assisting him during the time that you all

4    were caring for Mr. Coombs, is that correct?

5    A    Yes.

6    Q    And you actually earned some money doing that, didn't you?

7    A    Yes.

8    Q    How much did you earn?

9    A    I couldn't tell you the amount.

10   Q    You don't remember?

11   A    I can't tell you the amount.

12   Q    Okay.  Were you paid a regular salary?

13   A    I was paid a rate.

14   Q    Did you ever get any gifts from Mr. Coombs, financial

15   gifts?

16   A    Yes.

17   Q    How much?

18   A    Don't remember.

19   Q    Would you remember if you got one for like $11,000?

20   A    Yes.

21   Q    And you got one of those, didn't you?

22   A    Yes.

23   Q    Okay.  Well, that was a lot of money, wouldn't you agree?

24   A    Yes.

25   Q    And that came from Mr. Coombs' accounts that Mr. Cohn was

1  helping him with, right?

2  A    If you want to put it like that.

3  Q    Okay.  So I mean you were in the picture, let's put it

4  that way, during the time Mr. Coombs was in the house before he

5  died and Mr. Cohn and your mother, Patricia Foreman, were

6  keeping care of him?

7  A    And myself, yes.

8  Q    And yourself.  All right.  And during this time you

9  indicated, too, that Mr. Cohn at least during the time that

10  you've known him, has always complained about a frisky back,

11  bad back?

12  A    Yes.

13  Q    He did, did he not though, in 2006 in the same period

14  Mr. Coombs was still alive, buy a Hummer?  Do you remember the

15  Hummer?

16  A    Yes, I remember the Hummer.

17  Q    The big orange Hummer that said Bad to the Bone across the

18  front?

19  A    What does that have to do with his back?

20  Q    Aren't Hummers, a guy like me needs a ladder to get into

21  them.  Now he was --

22  A    Excuse me?

23  Q    He was able to get in and out of that Hummer pretty well,

24  wasn't he?

25  A    Yes.  He had it.

1   Q    Just asking.  And you say that you're a massage therapist?

2   A    Yes.

3   Q    And are you licensed?

4   A    Yes, I am.

5   Q    You're licensed in what states?

6   A    In Kansas.

7   Q    In Kansas?

8   A    Yes.

9   Q    Okay.  Where did you go to school?

10   A    High Tech Institute in Missouri.

11   Q    High Tech?

12   A    Institute, yes.

13   Q    Where is that located?

14   A    9001 State Line, Kansas City, Missouri.

15   Q    And when did you attend High Tech?

16   A    I graduated in June '06 so I was there for 18 months.

17   Q    You graduated, I'm sorry, when?

18   A    June '06.

19   Q    June of '06?

20   A    And I was there for 18 months.

21   Q    And have you ever been employed anywhere specifically as a

22 massage therapist?

23   A    Yes.

24   Q    And where are those places?

25   A    SS Massage.

1   Q    Where is SS Massage located?

2   A    It's located in Overland Park, Kansas, off 83rd.

3   Q    And what period of time, approximately, did you work

4   there?

5   A    From June 13 of '08 currently.

6   Q    And you still work there?

7   A    Yes.

8   Q    Now, did you attend the hearing in March of '08, earlier

9   this year, when Mr. Cohn was released on bond?

10  A    Yes.

11  Q    Okay.  And at that time Mr. Cohn was in a wheelchair

12  similar to today?

13  A    Yes.

14  Q    And he represented, his attorneys represented to the Court

15  that he was incapacitated and needed to get out on bond to get

16  treatment.  Do you remember that?

17  A    Yes.

18  Q    Okay.  And was it your understanding from being there and

19  being, obviously, an interested person in all of this, that

20  Mr. Cohn was to get out on bond but be restricted to his house

21  except for times that he went to get treatment.  Did that sound

22  like a fair statement from what you recall?

23  A    No.  I don't recall that exactly.

24  Q    Do you know or do you recall any time during the time he

25  was released on bond for a little bit over a month of Mr. Cohn

1   going to a doctor or hospital to get treatment for his back?

2   A     No, he did not.

3   Q     And throughout this time, you all were still residing at

4   the house on East 76th Terrace, is that correct?

5   A     Yes.

6   Q     And you then provided him what you called home treatments?

7   A     Yes.

8   Q     Based on your massage expertise?

9   A     Yes.

10  Q     Okay.  Now, going into the civil settlement, you have --

11  your mother is Patricia Foreman, right?

12  A     Yes.

13  Q     You have another adult sister as well?

14  A     Yes.

15  Q     What is her name?

16  A     LaShondra McLaughlin.

17  Q     And did not LaShondra also assist you and Patricia Foreman

18  and Mr. Cohn during the time you all were engaged in helping

19  Mr. Coombs?

20  A     Yes.

21  Q     Okay.

22  A     Off and on.

23  Q     And how old is LaShondra?

24  A     LaShondra is 27.

25  Q     Okay.  And she doesn't reside at that house on 76th

1    Terrace, is that correct?

2    A    No, she does not.

3    Q    Whose idea was it to set up the account in your name?

4    A    You would have to ask his lawyers, Dan's lawyers.

5    Q    Who approached you about doing it?

6    A    You would have to ask Dan's lawyers.

7    Q    I mean, let me ask it another way.  Did the lawyers

8    approach you?

9    A    Yes.

10   Q    Okay.  And what, which lawyers?

11   A    I don't remember which one at the time exactly.

12   Q    We have Mr. O'Connor here today.  I think you have seen

13   out in the hallway Mr. Waldeck?

14   A    Yes.

15   Q    Either one of those?

16   A    It could have been both.  There's been so much going on.

17   That's why my mind is kind of cloudy.

18   Q    What was said to you by one or both of those lawyers?

19   A    That, basically, what you had stated earlier just about

20   the account.

21   Q    Who wanted the account in your name?

22   A    I plead the Fifth.

23   Q    You plead the Fifth?

24   A    Yes.

25          MR. O'CONNOR:  I don't think -- I don't know why

1    that's being done, Your Honor.  But I can tell the Court as an

2    officer of the court, Mr. Waldeck, the settlement, I wasn't --

3    and Mr. Waldeck will speak to it.  But that's who spoke to her.

4    We can get that issue resolved.  I don't know why she would be

5    doing that.

6              THE COURT:  Mr. Warner?

7              MR. WARNER:  I don't know, Your Honor.  I don't know

8    if it's a non-responsive answer or if the witness feels she has

9    exposure.

10             MR. O'CONNOR:  Judge, she's my witness.  Do you mind

11   if I speak with her?

12             THE COURT:  I'll let you do it on re-direct when

13   Mr. Warner finishes.

14   BY MR. WARNER:

15   Q    Just to clarify, ma'am, you're taking the Fifth for the

16   question that was asked, who wanted this account in your name?

17   A    Yes.

18   Q    Do you feel like you've done something wrong or?

19   A    Not -- no, not at all.  It's just that you're asking me

20   the specific question when earlier you was asking me a question

21   about the account.  Therefore when you ask me the question

22   about the account of who did I go to set up the account with,

23   so therefore it's self-explanatory.  Why would you have to ask

24   me that question because that's not the issue that we're on

25   right now.  I mean not as far as you asking me the question but

1  as far as the issue in court today.

2  Q    Well --

3           THE COURT:  Ms. McLaughlin, you don't get to decide

4  what questions are relevant and what questions are not.

5           THE WITNESS:  I understand that.

6           THE COURT:  The legitimate belief that your answer to

7  a question might expose you to prosecution, that is a

8  legitimate basis to take the Fifth Amendment.  Merely objecting

9  to the question is not.  Do you understand?

10          THE WITNESS:  I understand fully.

11 BY MR. WARNER:

12 Q    And if I could inquire further.  I mean, my question to

13 you, ma'am --

14 A    Uh-huh.

15 Q    And it was, I'll try to state it again as directly as I

16 can.  My question was to you, originally, who wanted the

17 account in your name?

18 A    The lawyer.

19 Q    Okay.  And you indicated that you did not think doing that

20 was any type of wrongdoing by you, right?

21 A    Right.

22 Q    Did the lawyers indicate that Mr. Cohn wanted the account

23 in your name?

24 A    No.

25 Q    Okay.  And this was money, obviously, from a civil

1   settlement in Mr. Cohn's name, right?

2   A    Yes.

3   Q    And you knew this money was money that had come out of the

4   lawsuit he had been involved in?

5   A    Yes.

6   Q    Okay.  So you get $140,000.  It's opened up in your name

7   and there are actually two accounts, a checking account and

8   money market account, right?

9   A    It was in my name but it wasn't to me.  It was to Dan but

10  it was in my name, yes.

11  Q    So you perceived that money as Dan's money?

12  A    Yes.

13  Q    And when he was out on bond, he had access to that money,

14  did he not?

15  A    No.  It's in my name.

16  Q    Well, I mean, you gave him an ATM card, apparently.  I

17  think you heard the testimony at the bond revocation hearing

18  that he pulled out $500 that day?

19  A    I don't have anything to do with that.

20  Q    Well, how would he be able to access that account if not

21  through you?

22  A    Well, my mother had the card so as far as me saying me,

23  that I gave him a card, there is no proof.

24  Q    So some how he was able to get access to that account?

25  A    Like I said, I gave my mother the card.

1   Q    All right.  And tell us about what you or others, since

2   that account is in your name and I'm sure you get financial

3   bank statements and that sort of thing.  How has that account

4   progressed from the time it was opened until now?

5   A    What do you mean by progressed?

6   Q    Well, has that money just sat there or have there been

7   withdrawals?

8   A    No, it hasn't sat there.  It's been used.

9   Q    And how much has been withdrawn, approximately, from that

10  account over the last year?

11  A    I don't know.

12  Q    You don't know.  How much say per month?

13  A    I don't know.

14  Q    Who's withdrawing the money?

15  A    We have it set up for our living, for bills.

16  Q    And you don't work, well, you work right now?

17  A    Yes.

18  Q    And you started when?

19  A    June 13th of '08.

20  Q    Okay.  You, and you didn't work any time from August of

21  '07 until that time period, correct?

22  A    I guess.

23  Q    And your mother, Patricia Foreman, doesn't work either?

24  A    No, she didn't.

25  Q    Would it surprise you that bank account records reveal

1    that consistently, some times twice a month, almost $10,000 is

2    taken out of that account and transferred to the checking

3    account?

4    A    Can you state the question again?

5    Q    Well, would it surprise you that the account history of

6    the money that was opened up in your name indicates that

7    there's been a consistent transfer of money from the money

8    market account into the checking account upwards to $10,000 a

9    month?  In fact, on June 16th of '08, $50,000 was transferred

10   into the checking account, right?

11   A    No, I wouldn't be surprised.

12   Q    Are you doing that?

13   A    Yes.

14   Q    Oh, you are doing it?

15   A    Yes.

16   Q    And over the summer was the kitchen remodeled at your

17   house?

18   A    No.

19   Q    What was the $50,000 for?

20   A    For living.

21   Q    For living?

22   A    Yes.

23   Q    And for you and your mom and you have two children, is

24   that correct?

25   A    I don't have any children.

1  Q    You don't have any children?  Okay.  Pardon me.  So your

2  living expenses can be as much, because on June 13th of '08

3  there was 5,000 transferred into the checking account and then

4  on June 16th of '08, $50,000 was transferred into the checking

5  account.  That's all for living expenses?

6  A    Yes.

7  Q    What kind?

8  A    Bills.

9  Q    Bills?

10  A    Uh-huh.  Everyday living.

11  Q    Okay.  Buy things like jewelry and items like that?

12  A    Maybe.

13  Q    Okay.  And were you ever instructed or, you know, did you

14  ever receive any communications either from Cohn directly to

15  you or from Mr. Cohn to your mother to you about how to handle

16  this money in these accounts?

17  A    No.

18  Q    At no time.  So you and your mother have access to all

19  this money and you're withdrawing it all the time and

20  transferring it around and spending it, even though it belongs

21  to Mr. Cohn?

22  A    It benefited Mr. Cohn as well.

23  Q    All right.  In what way?

24  A    The home and our living expenses.

25  Q    I'm sorry?

1    A    Our living expenses in the home.

2    Q    Was any money sent to Mr. Cohn when he was in custody?

3    A    Yes.

4    Q    Okay.  For what?

5    A    For his living as well.

6    Q    So Mr. Cohn, I mean you talked, you all talked regularly

7    on the phone?

8    A    He talked regularly with my mother on the phone.

9    Q    And do you know, firsthand, whether or not he ever talked

10   to your mother, then you heard about it from your mother, about

11   the money in the accounts?

12   A    Rephrase that again?

13   Q    Well, I mean, Mr. Cohn is in custody.  Look at it from his

14   perspective.  He's in custody.  He's got 140,000 due and owing

15   him.  He entrusted it to his daughter and his significant

16   other, wife.  I mean, doesn't it seem reasonable from time to

17   time he might be asking, hey, how's my money doing?

18   A    Yes.

19   Q    And did he do that?

20   A    Yes.

21   Q    Okay.  And did he know that all of this money was being

22   transferred out?

23   A    Yes.

24   Q    And did he approve of that?

25   A    Yes.

1    Q    Okay.  And you spoke to him directly about that?

2    A    Some times but mainly between him and my mother.

3    Q    So he knew, Mr. Cohn did, that there was an account in

4    your name?

5    A    Excuse me?

6    Q    Mr. Cohn, obviously, knew that there was an account with

7    his money in your name?

8    A    Yes.

9    Q    Okay.  That's all I have.  Thank you.

10              THE COURT:  Redirect?

11              MR. O'CONNOR:  Just one brief.

12                        REDIRECT EXAMINATION

13   BY MR. O'CONNOR:

14   Q    Was a roof repaired with some of this money?

15   A    Yes.

16   Q    That's all I have.

17              THE COURT:  Recross?

18              MR. WARNER:  No.  Thank you.

19              THE COURT:  Just a moment.

20              Ms. McLaughlin, during the period of time when

21   Mr. Cohn was out of custody, did he see a physician or doctor

22   of any kind?

23              THE WITNESS:  No, he did not.

24              THE COURT:  Was he prescribed any medication of any

25   kind by a physician or doctor?

1          THE WITNESS:  Not that I can recall.

2          THE COURT:  Did he receive any treatment for his back

3     other than the cold and hot applications that you gave him and

4     the exercises for mobility?

5          THE WITNESS:  No.  Just that.  And maybe ibuprofen

6     for the pain.

7          THE COURT:  All right.  Thank you, ma'am.

8                                        (Witness excused.)

9          THE COURT:  Mr. O'Connor?

10          MICHAEL WALDECK, DEFENDANT'S WITNESS, SWORN

11                        DIRECT EXAMINATION

12          THE COURT:  Mr. Waldeck, you're becoming a regular

13     witness in this courtroom.

14          THE WITNESS:  Yes, sir.  Nice to see you, Your Honor.

15     BY MR. O'CONNOR:

16     Q    State your name for the Court, please?

17     A    Michael Edward Waldeck.

18     Q    What do you do for a living?

19     A    I'm a trial lawyer.

20     Q    How long have you been a trial lawyer?

21     A    Forty-three years.

22     Q    Do you know Dan Cohn?

23     A    I do.

24     Q    I want to first, we've got two issues we're dealing with.

25     I want to first address the issues as relates to Dan's back and

1    your knowledge of that before we get into the financial issues.

2    A    Yes, sir.

3    Q    When did you first start representing Dan Cohn or

4    thereabouts?

5    A    Approximately two years ago.

6    Q    And before there was any criminal charges, is that

7    correct?

8    A    Yes, sir.

9    Q    And in that representation of him what did you know at

10    that time or even up to today as related issues he had with his

11    back, any surgeries or any issues along that line?

12    A    Well, he visited my office a number of times because we

13    had probably a couple thousand documents.  He was assisting me

14    in categorizing the documents and looking at them.  And just by

15    way of general discussion he talked about problems in moving

16    the transfer cases and boxes because of the back pain.  And he

17    and I had talked, since I had been a personal injury defense

18    lawyer for years, of the symptoms of low back problems and pain

19    radiating down his legs.  I was aware from time to time he had

20    bad days and others were okay.

21    Q    At some time when he was charged with the criminal

22    offense, did you have occasion to visit him while he was in

23    custody?

24    A    Yes, I did.

25    Q    Where would that have been?

1    A    Leavenworth.

2    Q    Did you also see him down in Bates County?

3    A    I saw him down in Bates County probably three or four

4    times.

5    Q    So how many times altogether would you say we have seen

6    him in custody while these charges were pending?

7    A    Approximately, a half dozen.

8    Q    And I think on two of those occasions, three, I think I

9    was with you twice in Bates, once in Leavenworth and you were

10   three on your own, I guess?

11   A    That's right.

12   Q    And let's go with when you first observed him in Bates

13   County, the first time you would have been alone.  How was he

14   brought to the room where you visited him?  And tell the Judge

15   how you best can describe how he appeared?

16   A    Okay.  He had the typical prisoner garb on.  He walked in

17   with a deputy.  We talked a little bit.  Since it was a small

18   room where he could sit, he was seated the first time.  And

19   during that visit he seemed to be perfectly normal.

20   Q    Okay.  Did you visit him again?

21   A    I visited him a second time because we were having some

22   problems with discovery in the civil case.  And at that time he

23   was assisted by one of the deputies in the room.  We cut short

24   because he was uncomfortable.  And I said I would get back with

25   him when I needed some more information.

1    Q    Then I think you and I went up there together.  And tell

2    the Judge, if you remember that occasion and how he was brought

3    in the room to visit with us?

4    A    Yeah, I do remember that occasion well, Your Honor.

5    Because, once again, he was assisted in the room but we were

6    having a pretty frank discussion about what information he had

7    and why some things were missing.  So it was a somewhat

8    contentious discussion.  I remember it for that reason.

9    Q    When you visited him at Leavenworth and the times you

10   visited him in jail, was he brought to the room in any

11   different way than just walking into the room?

12   A    Yes.  He was in a wheelchair.

13   Q    How many of the six occasions would he have been in the

14   wheelchair to your knowledge?

15   A    Two or maybe three.

16   Q    And this issue as it relates to his back, is it your

17   personal observation those are real issues or fake issues?

18   A    Well, the movement that somebody has with low back pain,

19   he's got a bulging disk, is something you can't continue to

20   fake.  You either have it or don't have it.  And my opinion, as

21   a layman, he clearly did have it.

22   Q    Was it your opinion that when we made the request for him

23   to get out on bail, that he needed medical treatment?  Our

24   belief from discussing with him and we believed he was going to

25   get that medical treatment?

1   A    We wouldn't have done it except for that.  We thought it
2   was of prime importance because he started having radiating
3   pain down the leg as I recall in a bulging disk case.
4   Q    Last time you visited Leavenworth when he was in the
5   wheelchair, clearly trying to get up to get in the wheelchair,
6   out of the wheelchair, seemed to be a monumental task as I
7   remember?
8   A    You and I talked to him and said, what can you do?   He
9   would get up to about three quarters position.  So he was
10  partially standing, partially sitting.
11  Q    He basically said he couldn't do any more?
12  A    He said he couldn't and that's what I observed.
13  Q    Okay.  Now, let's get to the settlement.  Tell the Judge
14  who the parties were in the settlement that was reached
15  regarding the will contest?
16  A    Yes, Your Honor.  We initiated the suit on behalf of Dan
17  Cohn.  And he was moving as plaintiff against what is the
18  Nelson Gallery and the Board of Directors of the Nelson Art
19  Gallery.
20  Q    At some point in time was there a settlement reached in
21  that matter?
22  A    There was.  We were probably halfway through the
23  depositions and we had taken most of the fact witnesses and it
24  went quite well for us and they tendered us a settlement.
25  Q    Is it fair to say you handled the civil part of this and I

1  handled the criminal part of this?

2  A    We've had that discussion many times.  You're the criminal

3  lawyer.  I'm the civil lawyer.  And we know that, yes, sir.

4  Q    As it relates to the civil settlement, at some point was

5  there a settlement reached for Dan Cohn?

6  A    There was.

7  Q    How much was it?

8  A    Total amount of settlement was $300,000.  He had

9  obligations to me and also to pay you for the criminal part of

10  it.  But the idea of the settlement was that this was a

11  settlement that was going to go to Dan and his family and his

12  step-children that were in that house at East 78th Terrace.

13  Q    And at some point in time did you get, have a check?  I

14  think there's something in evidence there.  Did you have a firm

15  check or a trust account check or check that you gave to the

16  Cohn family?

17  A    Yes.  What we did was we ran the check through, which was

18  an overall settlement check, payable to him and us as his

19  attorneys through my trust account.  And it was payable to

20  Lakesha, was the check we took over to the bank at the time.

21  But the settlement check, which I don't see here, was in the

22  amount of 300,000.  It resolved all the issues in the civil

23  case.

24  Q    And the amount that went to Mr. Cohn was what?

25  A    $150,000.

1    Q    All right.  And is there and the money was for Dan Cohn?

2    No question about that?

3    A    No.  The money was for Dan Cohn.  But we all understood it

4    got settled on the basis of constructive benefit conveyed to,

5    as a result of the settlement involved Lakesha, LaShondra, Pat

6    his wife or common law wife, all four of them.

7    Q    Was then there -- did you go to the bank with Lakesha and

8    her mom to set up the account?

9    A    Yes.  Actually Lakesha and I were the only two that went.

10   We went to U.S. Bank which is over there at 63rd Street by the

11   old Landing.

12   Q    The account, when it was opened up, there was a notation

13   on the account that Dan would be added to the account at some

14   time later, is that right?

15   A    Yes.  Because the bank regulations at U.S. Bank, and those

16   I've seen generally in my practice, would not have permitted

17   him to be on the account while he was incarcerated in jail for

18   whatever reason, wouldn't be able to sign the account cards and

19   present himself in the bank.

20   Q    All right.  So is there anything else about the settlement

21   that is noteworthy?

22   A    Well, I think what was noteworthy about the settlement, it

23   was driven by the idea that the Nelson was very concerned about

24   whether or not the allegations about Mr. Cohn were correct.  I

25   think we had satisfied them that they had real exposure and we

1    would win and could prove he had done nothing improper.

2    Q    Was there any secret in your mind as to this money being

3    put in this account?  Is that information you would have shared

4    with the government if they asked for account numbers or

5    information where that account was?  Was anything done to try

6    to preclude the government or someone else from finding that

7    money?

8    A    We anticipated the Nelson would ask for a confidentiality

9    agreement as they often do in these kinds of settlements.  They

10   didn't.  So it was just a regular settlement.  Could be

11   discovered by anybody who had reasonable authority for it.

12   Q    And if I would have asked you to disclose it to the

13   government as it relates to where the money was and whose

14   accounts, whose benefit, you would have shared that with me?

15   You would have allowed me to share that with them?

16   A    Certainly.

17   Q    And you were aware of the plea negotiations I was involved

18   in with them on a regular basis, is that correct?

19   A    Yes, I was.

20   Q    And we talked about that, is that right?

21   A    Yes.

22   Q    I think that's all I have.

23            THE COURT:  Mr. Warner?

24                        CROSS-EXAMINATION

25

BY MR. WARNER:

Q    Mr. Waldeck, I don't think you know me.  I might be the
only lawyer here you don't know but --

A    Nice to meet you, sir.

Q    You, too.  And you and Mr. O'Connor have worked together
over the years, is that right?

A    Yeah.  For a long time.  He's been in our office.  Then we
worked on things together even when we were separate.

Q    As you indicated that you tend to handle the civil side of
things and Mr. O'Connor handles the criminals?

A    Exactly.

Q    So you're kind of hand in glove but different sides of the
docket so to speak, right?

A    Yes.

Q    Now, going first to this issue of Mr. Cohn's back.  You
indicated in your direct testimony that you had visited him
many times, certainly probably from your work as a PI attorney,
you're familiar with lower back injuries?

A    I am, sir.

Q    And whether or not people fake those or not, right?

A    Yes, generally, I think so.

Q    And at least your lay opinion was as you indicated that
Mr. Cohn, at least in your mind, appeared to be in general need
of treatment?

A    Yes.

1   Q    Did you know or were you aware both at Leavenworth CCA and

2   in Bates County that Mr. Cohn had repeatedly refused treatment

3   from the medical staff of those institutions?

4   A    I'm not quarreling with you but what I understood was he

5   refused because it was a general practitioner who did the

6   examination which was the predicate for the treatment.  I think

7   both he and I were quite concerned that an orthopedic surgeon

8   didn't see his back or would have made the proper diagnosis.

9   Q    So it was your understanding, and I don't know if you were

10  called upon to represent this to the Court, I don't think you

11  did but Mr. O'Connor did, that if he were released, Mr. Cohn,

12  the purpose of him getting released was definitely to get

13  professional orthopedic physical care?

14  A    Yes.  That was part of the release.  It certainly was.

15  Yes, sir.

16  Q    And you anticipated at least in your mind, medical

17  treatment from, you just mentioned, an orthopedic?

18  A    Well, what I --

19  Q    Physician, correct?

20  A    Excuse me?

21  Q    I'm sorry?

22  A    What I anticipated was at some point an orthopedic surgeon

23  would be able to examine him.  I think the examination was the

24  key point rather than the treatment.

25  Q    Okay.  But you did anticipate a physician doing that?

1    A    Yes, sir.

2    Q    Okay.  And you characterized Mr. Cohn as a plaintiff in

3    the case with Nelson, is that correct?

4    A    Yeah.  He was one of the parties in the case.  Yes, sir.

5    Q    Actually this was a will or probate contest, is that

6    correct?

7    A    You know, I don't even do my own wills or estate planning.

8    But really it was filed as a civil action in the Circuit Court

9    on a pending probate.  But the idea was whether or not there

10   had been, what the effect was of the wills that were written at

11   the time they were written.

12   Q    Okay.

13   A    So we did go to the probate court is all I'm trying to

14   say, Mr. Warner.

15   Q    You indicated the settlement was for $300,000.  Roughly

16   half went to the lawyers and $150,000 went to Mr. Cohn?

17   A    That was it exactly, yes, sir.

18   Q    And that money was to him, Mr. Cohn, correct.  The check?

19   A    The settlement was to Mr. Cohn for the benefit of the four

20   people that I mentioned.

21   Q    And so it was for the benefit of Mr. Cohn and his family,

22   correct?

23   A    Yeah.  Those that were living in that house.  Yes, sir.

24   Q    And that was communicated to you by Mr. Cohn?

25   A    Well, I began to know them all, had them there at the

1  office to interview them and everything else.  I knew that one

2  of the key components of our case would be to establish that we

3  had a case that involved interested people beyond Dan Cohn.  So

4  that was part of my trial strategy.  I wanted to be sure they

5  were indicated.

6  Q    And Mr. Cohn communicated to you that he wanted his

7  settlement, his money to be used for the benefit of his family?

8  A    Yes, sir.

9  Q    Okay.  And so he knew he had it and they knew he had it,

10  right?

11  A    Well, not to put too fine a line on this but he didn't

12  have it.  Lakesha had it in the bank at that point in time.  He

13  did not have it and couldn't get at it.

14  Q    But he communicated to you to have an account opened up in

15  Lakesha's name, correct?

16  A    Yes.  In fact, I was the one who suggested to him that he

17  do that and that's what we did.  You're correct, sir.

18  Q    And Government's Exhibit No. 2 there before you, there was

19  an opening check and I don't know if you see it in there in the

20  amount of $500?

21  A    Give me just a second here.  Yes.  Yes, I do see it.

22  Q    Is that from your business account or your trust account?

23  A    This one, this is my business account, not my trust

24  account.  Because it's Country Club Bank.  Yeah, I think that's

25  my business account.

1  Q    What does the notation say on that $500 check?

2  A    Lakesha bank account.

3  Q    It says bank account?

4  A    My writing is so horrible you could probably call it

5  anything but that's my best judgment what it says.

6  Q    Then the $140,000 check I think is written a little bit

7  later?

8  A    Yes.

9  Q    Is that your handwriting?  It says, Cohn settlement?

10  A    It is.  All of it is my handwriting, yes, sir.

11  Q    Now, at the time this account was opened, it was August of

12  '07, is that correct?

13  A    That's what the documents say.  I'm sure that's correct,

14  yes.

15  Q    And you were aware that Mr. Cohn had been charged in March

16  of '07 with multiple counts of bank fraud?

17  A    Yes, generally.

18  Q    You were aware that he had been in custody for three or

19  four months by the time of August of '07?

20  A    Yes.

21  Q    And have you done much, even though you characterize

22  Mr. O'Connor as the criminal attorney, have you done any

23  criminal cases yourself?

24  A    A long, long time ago, back in the 60s.  As a young

25  lawyer, if you were doing trial work, you got a lot of

1　appointments.  So I got appointments for the first three or

2　four years until the Public Defender and Federal Defender came

3　into vogue and then I didn't have to do it.  So I haven't

4　handled a criminal case in probably 35 or 40 years.

5　Q    If you have questions, you certainly have someone who is

6　experienced?  Mr. O'Connor?

7　A    Certainly.

8　Q    I'm not trying to be too rudimentary here or anything but

9　in fraud cases and bank fraud cases, it's generally anticipated

10　that restitution could be ordered somewhere down the road,

11　right?  Assuming somebody pleads or is found guilty of bank

12　fraud, that is taking somebody else's money or whatever, it's

13　not atypical in criminal cases for restitution to be ordered.

14　Is that a fair statement?

15　A    It probably is.  I don't know.

16　Q    Okay.  All right.  Well, you were aware then that Mr. Cohn

17　did eventually plead guilty in this criminal case?

18　A    I am aware of that, yes, sir.

19　Q    And he actually pled guilty, I believe, to four, maybe

20　five, I forget, counts of bank fraud, correct?

21　A    Yeah.  The only recollection I have of it is just exactly

22　that, an issue of whether or not they were going to be able to

23　keep the house and that was going to be in dispute.  It was

24　something that I think at one time even you and I talked about

25　by phone.

1   Q    Okay.  Were you aware that as a result of that plea that a

2   presentence investigation report was being prepared?

3   A    Well, I don't know whether I was but I certainly would

4   expect that's what would happen.

5   Q    At any time did Mr. Cohn and or Mr. O'Connor contact you

6   for information about the Lakesha McLaughlin bank account to

7   provide to probation?

8   A    No.

9   Q    And had they asked, would you have given them that?

10  A    Well, sure.  He's the client.  I'll give him anything he

11  wants of his records.

12  Q    Did you ever call myself or Detective Panuco and say, hey,

13  we took the $150,000 that Cohn got in the civil settlement and

14  opened up an account for Lakesha McLaughlin.  Did you ever

15  communicate that to us?

16  A    I think she knew it but I don't remember if I communicated

17  it or not.  I don't really know.

18  Q    Well, you would agree however that that money, as you

19  indicated in your direct testimony, was, the understanding was

20  it was for the living expenses of significant others.  Is that

21  a fair statement?

22  A    Yes, that was part of what it was for.  Certainly.

23  Q    And something that Mr. Cohn directed you to disburse

24  specifically for the care and maintenance, economically, of his

25  family?

1   A    Actually what I did is, I went to visit with him in the

2   jail down in Butler.  Talked about it.  I said, this is what

3   you ought to do.  He agreed.  I said, who would be the most

4   responsible to do that?  We both agreed Lakesha McLaughlin, one

5   of the gals living in the house.  How they would use the funds,

6   I didn't get into it.

7   Q    Did you know while out on bond, briefly, he was able to

8   access those funds himself and withdraw money?  Were you aware

9   of that?

10  A    If they had a debit card and I don't know whether they

11  would.  He wouldn't have been able to write a check but he

12  certainly could have gotten it other ways, I suppose.

13  Q    All right.  I have no further questions.

14              THE COURT:  Redirect?

15              MR. O'CONNOR:  None.

16              THE COURT:  Just a couple of questions, Mr. Waldeck.

17              THE WITNESS:  Yes, sir.

18              THE COURT:  The only person that you represented was

19  Dan, Ringling Dan Cohn, is that true?

20              THE WITNESS:  It is, Your Honor.

21              THE COURT:  Do you recall the total value of

22  Mr. Coombs' probated estate?

23              THE WITNESS:  It would have been just whatever there

24  was for the car plus what could have been put in for the

25  settlement, I guess, Your Honor.

1          THE COURT:  Is it your recollection that the art

2     gallery gave you all the money that was in the Coombs estate?

3          THE WITNESS:  Oh, no, they did not.  I'm sorry.  I

4     misunderstood.

5          THE COURT:  That's my question.

6          THE WITNESS:  They did not.

7          THE COURT:  I want to know how much was in the estate

8     versus how much was given to Mr. Cohn?

9          THE WITNESS:  If we could start back.  I'm sorry.  I

10    misunderstood.  The account, the estate was suppose to have a

11    value in excess of $2 million.  I believe it was ultimately

12    determined it did not have that value.  Then there were some

13    specific requests, not of, I would assume would be more than a

14    million dollars and less than two, sir.

15         THE COURT:  I'm puzzled, Mr. Waldeck, by your

16    testimony that the check representing Mr. Cohn's money and

17    money for the benefit of his family was written on your

18    business account.  Generally, there is a rule against

19    commingling a client's money with your own.  I take it that

20    that happened in this case?

21         THE WITNESS:  Well, it appears to be a business kind

22    of check.  And I can't explain it any other way.  I had a trust

23    account at that time but I think the check was written on the

24    business account.  And I don't know why that was, Your Honor.

25         THE COURT:  Well, notwithstanding the fact that it

1    was written on the business account rather than the trust

2    account, there was never any question in your mind or in the

3    mind of Mr. Cohn or his family that the money was theirs?

4            THE WITNESS:  Absolutely.

5            THE COURT:  Thank you.

6            Anything further?

7            MR. O'CONNOR:  No, Judge.

8            MR. WARNER:  No, Your Honor.

9            THE COURT:  Thank you, Mr. Waldeck.  You're excused.

10                                      (Witness excused.)

11           MR. O'CONNOR:  That's all the witnesses I have, Your

12   Honor.

13           THE COURT:  This is not a complicated issue but if

14   you want to make some brief argument in support of your

15   respective positions, this would be the time to do that.

16           Mr. Warner?

17           MR. WARNER:  Your Honor, concerning the issues before

18   the Court, I would rest on the evidence.

19           THE COURT:  Mr. O'Connor?

20           MR. O'CONNOR:  If I may speak, please?

21           Judge, I'm going to just talk about the two issues

22   that we're dealing with here and not reinvent the wheel here as

23   relates to earlier agreement with the government which I know

24   the Court was well aware of.

25           I'm going to first address the issues with Mr. Cohn's

back.  There was no question in my mind or in Mr. Waldeck's mind when we went in front of Judge Larsen that there were serious issues with Mr. Cohn's back.  It was evident to me in all my meetings with him and I even had questions with the marshals when he was at Bates because part of their thinking was that he was faking.  I said to them, I'm not sure if he is or isn't.  We were trying to get him out of there and get him somewhere else because they really didn't have any facilities to really treat anybody.  I was open to the idea he could be faking.  In fact, the first couple times that was in the back of my mind.  But the more times I visited him, the more times I was around him, it became more and more evident to me.

It was my understanding and full belief that when he was released by Judge Larsen that he was going to seek treatment.  In fact, I even called him as a result of me finding out through people from the courthouse when in fact he got out, he got out of his wheelchair and walked into a car.  I said, that's a matter of time before something like that gets back to Judge Larsen.  I called him on the phone.  Said, look, you need to go see a doctor.  You need to go get an evaluation because you may be back in front of Judge Larsen next week.  If this gets back to Larsen, I don't know if that's true what happened.  That was told to me like third hand.  At that time my client told me he did not have an insurance card.  Could not go do that, an identification which had been on his arrest.

1    Told him to make arrangements to do that.  Obviously, he didn't

2    do that.  That, I'm sorry.  He didn't do that.

3         But that does not take away from my sincere and

4    honest belief there are issues.  I still think there's issues

5    with his back.  Do they rise to the level of which they were

6    portrayed?  In terms of what was later observed of him?

7    Obviously, there is some evidence to the contrary.

8         I can tell you that all this talk about him coming in

9    a wheelchair, he has been in a wheelchair.  And I think the

10   marshals will attest, the reason they bring him in a wheelchair

11   is that they can't give a cane because that can be a weapon.

12   Can't give him a walker because that can be a weapon.  So can

13   he walk now without the wheelchair?  Yeah.  That's not the

14   impression I'm trying to give you, that he's here in a

15   wheelchair because he can't walk.  He's here in a wheelchair

16   because that's the only way the facilities have of bringing

17   someone who otherwise needs assistance to get where they're

18   going because they don't give them these other instruments

19   because they're instruments that can be used against the guards

20   or maybe even the attorney.

21         So this is not a misnomer when I have seen him in the

22   wheelchair, doesn't mean he didn't need a wheelchair.  He just

23   needed assistance from where he was.

24         And I can tell you on one occasion when he was in

25   Bates, they literally, took two guards to get him into the

1  wheelchair, to get him back, to take him back up after a short

2  meeting with Mr. Waldeck and I, because he was in so much pain.

3  And at that time there had been no discussion, Judge, none,

4  about him getting out of jail.  In fact, there's never been any

5  discussion about him ever getting out of jail.  You can count

6  on one hand in 18 years the number of times I've had a client

7  detained, who got out before or after a plea.  Probably less

8  than five.  So that's a rare occasion.  That only came up at

9  the very end, when I was trying to secure a plea agreement and

10  trying to convince Mr. Warner that he does need care.  And I

11  think this will also help us effectuate a plea in this case.

12  Doesn't take away from the client being guilty.  He wasn't

13  pleading because he was going to get out.  But it sure helped

14  in terms of his mind getting the case revolved.  So that was

15  part of the discussion.  So that's that argument.

16        As relates to these assets, and I don't want to

17  understate this, overstate it or understate it.  I think it's a

18  tempest in a teapot.  The government was aware of the

19  settlement.  There was never any secret about the settlement.

20  The, in fact, some of the negotiations about this case,

21  settlement of this case, there were discussions of the

22  settlement.  If the government would have said to me, hey, we

23  need to have these numbers to spark the settlement, it would

24  have been a given.  For me to get the 34-month sentence, to do

25  whatever it was going to take.  We were getting a substantial

1    break in this case in light of the evidence.

2            So I just think that even though this form was not

3    filled out properly, there is no argument about that.  The

4    question is did the government have the information?  Were the

5    assets available?  And if the Court wanted to order restitution

6    or whatever was going to happen as related to that information,

7    everybody had it.  Just a matter of who had it and when they

8    had it.  I think Ms. Richart testified she had it at the point

9    that he was taken back into custody.

10            So I think the argument is somewhat false in that,

11   although they needed this information, they had it or had

12   access to it at any point in time.  And so when it comes back

13   to the adjustment because you go from a plea or a deal that you

14   believe you have of 34 months to now this being void.  And I

15   understand the government's argument.  Based on their argument,

16   they have a right to say what they're saying.  I'm not saying

17   they don't.

18            I'm just saying, in light of the parties agreements

19   that now we're, basically, now punishing the defendant on

20   information we had access to or could have known.  Or trying to

21   use that now as a weapon against him.  And I do believe that

22   although he did not seek the medical care, that, obviously, be

23   tempered in the sentence the Court deems appropriate.  That

24   maybe would not honor the agreement of the parties.  But I

25   don't think it's much more than that.  And that's what I say to

1    the Court.

2           I think my client would like to say something before

3    you sentence him.  Is that where we're going next?

4           THE COURT:  We're going to determine the appropriate

5    guideline range and I'll hear any comments you want to make in

6    support of whatever sentencing recommendation you wish to make.

7    And, of course, Mr. Cohn will be given the opportunity to speak

8    before sentence is imposed.

9           MR. O'CONNOR:  Thank you, Your Honor.

10          THE COURT:  My conclusion is Mr. Cohn did obstruct

11   justice in this case.  I do not doubt that he has back pain.  I

12   do think that he has overrepresented to this Court the amount

13   of back pain that he actually is experiencing.  And I think

14   that is supported by the fact that the only medication,

15   according to his daughter, that he is taking is ibuprofen.

16          Further, it is belied by the fact that he did not

17   make an effort to see an orthopedic or neurosurgeon during

18   that period of time this Court released him so he could do

19   that.  That alone I don't think is sufficient to support the

20   obstruction enhancement.

21          However, when it is overlaid on the failure to reveal

22   significant assets to this Court, in what is now identified as

23   Government's Exhibit 1, suggests that he was attempting to

24   manipulate the system for his own benefit.  Regardless of whose

25   name was on the account, the money was Mr. Cohn's.  He was the

1  only party to the lawsuit.  If he chose to use it for the

2  benefit of his common law wife and common law step-children, he

3  can certainly do that.  But it was his money.  And he knew that

4  it was his money.  And he knew he had access to that money at

5  the time he filled out the financial statement requested by the

6  probation office and he failed to reveal it.  I conclude that

7  he failed to reveal it because he didn't want to put it at risk

8  of being forfeited or being subject to an order of restitution

9  in this case.  I think that is a very significant and material

10 misrepresentation and one that justifies the two-level

11 enhancement for obstruction.

12        It is a rare case in which an obstruction enhancement

13 is awarded and credit for acceptance of responsibility is also

14 awarded.  I don't think that this is that kind of unusual case.

15 And so the 3-level reduction for acceptance of responsibility

16 will not be given to Mr. Cohn.

17        Additionally, because I find that he has violated the

18 plea agreement, specifically Paragraph 19 of the plea

19 agreement, I find that the government is not bound to the

20 amount of the loss agreed to in the plea agreement.  It is

21 undisputed really that the amount of the loss in this case is

22 the sum which is at least $640,820.28.  Because the amount of

23 the loss exceeds $600,000, instead of a ten-level increase

24 agreed to in the plea agreement, I find that an appropriate

25 increase would be 14, pursuant to 2B1.1B1H of the sentencing

1    guidelines.

2          With those changes Mr. Cohn's total offense level is

3    now 25, his criminal history category is 4.

4          The United States Sentencing Guidelines would advise

5    a sentence of imprisonment between 84 and 105 months.

6          In addition to considering the guideline range, I am,

7    of course, required to consider the factors in 18 USC 3553(a)

8    and will do so.  However the attorneys may wish to address some

9    or all of those factors in their remarks concerning an

10   appropriate sentence.

11         Mr. O'Connor, I'll give you first swing here.

12         MR. O'CONNOR:  Judge, obviously, the decision of the

13   Court is, we're sorry the Court has made those findings, I

14   understand from the evidence the Court has.  I'm just going to

15   take you back to the obvious agreement before this was a

16   34-month sentence which the government believed was appropriate

17   under the circumstances and now that has changed.  Now, we're

18   at a potential 84-month sentence.

19         And since the guidelines are advisory and the Court

20   has discretion, I would just ask the Court to use that

21   discretion and temper the sentence that you're going to give

22   with the agreement that the parties had and now where we are,

23   even if you doubled the 35.  In other words, if he was going to

24   be punished twice, you would be at 68 months at a low and I

25   think even anticipated plea on this case without the agreement

1  of the parties would have been something less than 45 months.

2  I think it was.  46 months.

3          The Court has made its finding as to these issues and

4  so I would just ask the Court to temper a sentence in this case

5  that somewhat takes into account the agreement that was reached

6  and somewhat takes into account the Court believes the

7  defendant deserves of the conduct while out on bond.

8          I guess I've never somewhat understood this

9  acceptance of responsibility in a lot of ways because when

10  someone pleads guilty and takes the chance of going to jail and

11  admits to what they've done.  I understand that if obstruction

12  comes, that you get the two points.  But when you get the extra

13  added, that's taken away.  There's never been a change from the

14  plea or admission of what he did.  There's never been a change

15  as relates to his acceptance of his conduct.  So I would ask

16  the Court to consider, although you made that finding as to

17  those 3 points, you would consider that also in determining

18  what you believe the sentence is appropriate in this case.

19  Thank you.

20          THE COURT:  Thank you.

21          Mr. Warner?

22          MR. WARNER:  Your Honor, in several in camera

23  discussions we've all had concerning this case, the government

24  had communicated to the Court that given the circumstances, the

25  changed circumstances that have occurred between the time of

1    the defendant's plea and certainly now, sentencing, the

2    government was not going to take a specific position on

3    sentencing but allow the Court to determine a reasonable

4    sentence.  And I would stand by that position.

5          I'm not wanting, again, to open up any more

6    discussion, if the Court feels satisfied in its guideline

7    calculations.  I do know on Pages 13 and 14 some additional

8    enhancements that were recommended by the presentence report

9    that are undisputed.  That would effect the ultimate offense

10   level.  I would just point that out which does indicate an

11   offense level of 31 as opposed to 25.  Other than that, Your

12   Honor, that's all I have.

13         THE COURT:  All right.  Thank you.

14         Let me just respond to that, Mr. Warner, before I

15   hear from Mr. Cohn.  Mr. O'Connor correctly stated earlier that

16   it is normally this Court's practice to accept the agreements

17   of parties.  And there is an overriding reason for that.  That

18   is that it encourages parties to get together and work out

19   their differences.  And if we had to try every case which comes

20   into this court, we simply could not do it.  We would be

21   overwhelmed by the number of cases.  And so it's important in

22   the overall administration of justice that agreed resolutions

23   be encouraged.

24         And it was for that reason that when the parties came

25   to me prior to Mr. Cohn's plea of guilty that I indicated a

1    willingness to accept the parties agreement with respect to the

2    sentencing range, which we thought applied at that time.

3           Likewise, I met with counsel before we came into

4    court today.  And Mr. Cohn authorized his attorney,

5    Mr. O'Connor, to withdraw all of his objections to the

6    presentence report except those relating to obstruction and

7    acceptance of responsibility.  And in the course of that

8    conversation I did a preliminary guideline calculation that

9    resulted in a total offense level of 25 and criminal history

10   category of four.  I believe that is what we were talking

11   about.  I believe that that in part was why Mr. Cohn withdrew

12   his other objections to the presentence report.  And so that is

13   the guideline range which I find applies to this case and those

14   are the reasons why I make that finding.

15          Mr. Cohn, I'm going to allow you to speak from the

16   seated position if you would like to do that.  If you want to

17   approach the lectern, you're certainly welcome to do that.

18   Whatever is most comfortable.

19          Mr. O'Connor, would you direct the microphone down,

20   please?

21          DEFENDANT COHN:  To tell you the truth, Your Honor,

22   I'm at a loss for words.  But I'm not going to dispute your

23   ruling.  There's no need in going over everything involved in

24   you making your ruling.  I'm not going to dispute anything.

25          Further, all I would ask is that I want you to know

1   that I take full responsibility for what I have done.  I've

2   never shirked that responsibility.  I take accounting for my

3   actions.

4         That being said, I have a family and loved ones, too.

5   They have suffered greatly because of this.  Some of it brought

6   on by me, some of it not.  I want very much to be back with my

7   family.  You saw how protective my daughter can be of me.  I

8   just ask to give me a chance for a fair sentence, sir.

9         Thank you.

10         THE COURT:  I'm required to consider the guideline

11   range calculated under the sentencing guidelines of 84 to 105

12   months of imprisonment.  Further, I'm required to consider the

13   factors in 18 USC 3553(a) and impose a sentence which is

14   sufficient but not greater than necessary to comply with the

15   purposes of that statute, considering the nature and

16   circumstances of the offense and the history and

17   characteristics of the defendant.

18         This is not, in my view, a typical bank fraud case.

19   There are, I've seen many, many bank fraud cases where there

20   was an abuse of trust.  But I don't believe that I have seen

21   one where the trust was abused as egregiously as I see the ones

22   in this case.  Mr. Cohn accepted the responsibility, perhaps

23   sought, but at least accepted the responsibility of caring for

24   Mr. Coombs.  Paragraph 39 of the presentence report recites

25   that on September 13, 2005, the Jackson County Division of

Aging contacted Mr. Coombs at Cohn's residence. Mr. Coombs was located in the basement of the residence wearing an old knit shirt and a diaper. He was covered with an old dirty blanket. Mr. Coombs was extremely dehydrated and confused. He was unable to leave the room as he was bedridden. He did not have access to a telephone. The basement bathroom was filthy and unusable. He was removed from the residence and died twelve days later at the age of 87 of natural causes.

A subsequent search of the residence revealed new furniture in almost every room of the home, two large screen television sets, new silverware, new accessories and numerous photographs of the Cohn family which had been taken and framed professionally.

Mr. Cohn was under no obligation to care for Mr. Coombs. But having voluntarily undertaken that obligation, he failed in almost every respect to meet the standard of care that one would ordinarily expect and insist upon in the care of an aging and infirmed individual.

Aside from considering the nature and circumstances of the offense, I'm required to consider the history and characteristics of the defendant. Beginning at Page 14 of the presentence report and carrying through Page 17 of the presentence report are Mr. Cohn's prior criminal convictions. At age 19, three counts of stealing. At age 20, stealing by force and assault. At age 23, auto theft. Age 34, armed

1   robbery, involving the use of a knife.  Age 41, in Paragraph

2   68, harassment.  Age 44, simple assault.  Age 44, destruction

3   of property.  Age 47, attempted stealing two counts and

4   stealing, and then two driving convictions.  In addition

5   there's a pending charge of theft of poker chips from a black

6   jack table at Harrah's.

7         Then there are two pages of other arrests which did

8   not result in convictions.  All of which suggest that Mr. Cohn

9   has little respect for the law and the requirements of the law

10  or that he is unable to conduct himself in a fashion in which

11  he complies with the law.

12        In addition to the stealing charges, the armed

13  robbery and stealing by force and assault charges cause me to

14  believe that Mr. Cohn has a violent nature.  And may well

15  represent a serious threat to the public.

16        The sentence I impose should be one that reflects the

17  seriousness of the offense.  We've talked about that.  One

18  which promotes respect for the law and constitutes just

19  punishment.  It should be one that affords an adequate

20  deterrence to criminal conduct and that doesn't mean just to

21  deter Mr. Cohn.  That means to deter others who may view these

22  proceedings and to alert them that there are serious

23  consequences for the type of conduct engaged in by Mr. Cohn.

24        It should protect the public from further crimes of

25  the defendant.  A lengthy period of imprisonment in my view is

1  necessary to accomplish that objective of protecting the

2  public.

3       It should take into account the kinds of sentences

4  available and avoid unwarranted sentence disparities between

5  this defendant and other defendants who have been convicted of

6  the same or similar offense, occupying the same or similar

7  criminal history background.  A sentence within the guideline

8  range would, I believe, avoid unwarranted sentence disparities.

9       The question then becomes where within that guideline

10  range.  It is uncommon for this Court to view a defendant

11  preliminary to sentencing and be unable to articulate any

12  redemptive qualities.  This is an uncommon case.

13       Mr. Cohn, I despise the conduct that you engaged in,

14  in this case.  And it's very difficult for me to get past my

15  sense of moral outrage and try to arrive at a sentence which is

16  reasonable and one that is arrived at dispassionately.  But I

17  will try to do that.

18       Pursuant to the Sentencing Reform Act of 1984, it is

19  the judgment of this Court that the defendant, Ringling Dan

20  Cohn, is hereby committed to the custody of the Bureau of

21  Prisons to be imprisoned for 96 months on each of Counts 3, 6,

22  10 and 12 to be served concurrently.

23       Upon release he will be on supervised release for 5

24  years on each of the counts of conviction.  Those terms to be

25  served concurrently.

1       I find that in light of the restitution obligation

2   Mr. Cohn lacks the ability to pay a fine.  The fine will be

3   waived.

4       I impose special assessments totaling $400 which is

5   due and payable to the United States immediately.

6       On Counts 3, 6, 10 and 12, restitution in the amount

7   of $640,820.28 is imposed.  That amount is due in a lump sum

8   and due and payable immediately.  If Mr. Cohn is unable to pay

9   that amount immediately, he'll be permitted to make payments of

10  at least 10 percent of his earnings while incarcerated and at

11  least 10 percent of his gross income or $150.00, whichever is

12  greater while on supervision.

13      Restitution shall be paid for the benefit of the

14  Nelson Art Gallery Foundation at the attention of Curtis Woods,

15  Esquire, at the address reflected in the presentence report.

16      While restitution is owed Mr. Cohn will be required

17  to notify the United States Attorney of any change of address

18  and both the United States Attorney and this Court if there is

19  a material change in his economic circumstances.  Interest on

20  the restitution obligation is waived.

21      While on supervised release Mr. Cohn will have to

22  comply with the mandatory standard conditions of supervised

23  release adopted by this Court and the following special

24  conditions.  He must pay any restitution balance within the

25  first 54 months of supervision on a schedule set by this Court.

He must provide the probation office with access to any

requested financial information.  He'll be prohibited from

opening new lines of credit or obtaining credit charges without

the approval of the probation office, while restitution is

owed.

He'll be required to submit his person, his

residence, his office or his vehicle to a search conducted by a

U.S. Probation Officer at a reasonable time, in a reasonable

manner, based upon a reasonable suspicion of contraband or some

evidence of a violation of a condition of his supervised

release.  Failure to submit will be grounds for revocation.

And other residents of the premises should be warned that the

defendant's premises may be subject to searches pursuant to

this condition.

He'll be required to satisfy any outstanding warrants

or pending charges within the first 90 days of his supervised

release.  He'll be prohibited from entering any gambling

establishment or engaging in any kind of gambling including

offshore or Internet gambling.  He will not be employed in any

vocation in which he will act in a fiduciary capacity.

Mr. Cohn is remanded to custody for service of the

sentence imposed.

Mr. Cohn, you have the right to appeal both the

finding of guilt and the sentence I have imposed in this case.

With few exceptions any notice of appeal must be filed within

1   ten days.  If you are unable to pay the cost of an appeal, you

2   can apply for leave to appeal as a poor person.  If you ask,

3   the Clerk of the Court will prepare and file a notice of appeal

4   on your behalf.  If you do not ask, that will not happen.

5           Your plea agreement limits your right to appeal.

6   That limitation is found in Paragraph 15.  The Court of Appeals

7   has generally enforced those limitations.  However if you

8   believe that yours should not be enforced, you can present that

9   argument to that court.  Do you understand that?

10          DEFENDANT COHN:  Yes, sir.

11          THE COURT:  Mr. O'Connor, anything further?

12          MR. O'CONNOR:  No, Judge.

13          THE COURT:  Mr. Warner?

14          MR. WARNER:  No, Your Honor.

15          THE COURT:  All right.  We're adjourned.

16                          *   *   *

17                        CERTIFICATE

18  I certify that the foregoing is a correct transcript from the

19  record of proceedings in the above-entitled matter.

20

21  12/7/2008                    /s/ Cynthia M. Johnson

22

23

24

25